CONAIR CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Local 222, International Ladies' Garment Workers' Union, AFL–CIO, Intervenor.

No. 82–1623.

United States Court of Appeals, District of Columbia Circuit.

Argued July 6, 1983.

Decided Nov. 15, 1983.

Herbert Burstein, New York City, for petitioner. Randy Lewis Levine and David A. Kapelman, New York City, also entered appearances for petitioner.

Marjorie S. Gofreed, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., was on brief, for respondent. Paul Spielberg, Atty., N.L.R.B., Washington, D.C., also entered an appearance for respondent.

Max Zimny, New York City, with whom Jesse H. Strauss, Sidney Reitman, Bennet D. Zurofsky, Newark, N.J., Laurence Gold, and David M. Silberman, Washington, D.C., were on brief, for intervenor.

Carl L. Taylor, Stephen A. Bokat and Tom Kirby, Washington, D.C., were on brief for the Chamber of Commerce of the United States, amicus curiae urging that the order be set aside.

Gerard C. Smetana, Chicago, Ill., was on brief for the Council on Labor Law Equality, amicus curiae urging that the order be set aside.

Michael E. Avakian, North Springfield, Va., was on brief for Center on National Labor Policy, amicus curiae urging that the order be set aside.

Before WALD, GINSBURG, and SCALIA, Circuit Judges.

Opinion for the Court in parts I–V.B filed by Circuit Judge GINSBURG.

Opinion for the Court in part V.C filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge GINSBURG.

Separate concurring statement filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case presents a controversial question in federal labor relations law. Centrally at issue is the scope of authority Congress accorded the National Labor Rela-

tions Board (NLRB or Board) under the National Labor Relations Act (NLRA or Act) to issue a bargaining order when an employer has committed " 'outrageous' and 'pervasive' unfair labor practices ... of 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable [representation] election cannot be had.' " [1] The Supreme Court so described a category of cases in *NLRB v. Gissel Packing Co.,* and thereby opened the question whether a bargaining order might issue to redress the employer's grave misconduct even though the union involved never received authorization cards from a majority of the bargaining unit employees and lost a representation election.[2] We confront here the situation the Supreme Court described but did not decide in *Gissel:* the employer engaged in "outrageous" and "pervasive" unfair labor practices; the union never achieved a card majority, it did not otherwise demonstrate majority support, and it lost the representation election; the NLRB, in a three to two decision, issued a bargaining order.

On December 7, 1977, Local 222 of the International Ladies' Garment Workers' Union (Union) lost a representation election among the production and maintenance employees of Conair Corporation (Conair or Company). Joint Appendix (J.A.) 583a–84a. In administrative proceedings brought by the Board's General Counsel to set aside the results of the election and to remedy the Company's unfair labor practices, an Administrative Law Judge (ALJ) found that Conair had engaged in "outrageous" and "pervasive" unfair labor practices. *Conair Corp.,* 261 NLRB 1189, 1285 (1982). The ALJ's proposed order directed Conair to implement extraordinary notice and access remedies, including a requirement that Conair's president personally read the NLRB's remedial notice to an assemblage of the company's employees. The ALJ declined to recommend a bargaining order, however, because the union never obtained authoriza-

---

1. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 613–14, 89 S.Ct. 1918, 1939–40, 23 L.Ed.2d 547 (1969).

2. *See id.*

tion cards from a majority of the bargaining unit employees. *Id.* at 1284–85 & n. 451 (noting that the NLRB had not yet issued a bargaining order absent a card majority).

The Board affirmed the ALJ's findings of fact, amending them only to include a finding that Conair had actually discharged its striking employees on April 22, 1977. *Id.* at 1189–90. Adopting the notice and access remedies proposed by the ALJ, the Board further ruled that Conair's "massive and unrelenting coercive conduct" warranted imposition of a bargaining order. *Id.* at 1192–94.[3] Conair has challenged the NLRB's decision.

We conclude that Conair did not receive fair notice of, and opportunity to respond to, a claim that it actually discharged striking employees on April 22, 1977; we therefore decline to enforce the Board's order in that particular. On the central issue, we hold that Congress has not empowered the Board to issue a bargaining order absent a concrete manifestation of majority employee assent to union representation; we therefore decline to enforce the NLRB's bargaining order. In all other respects, we deny Conair's petition for review and grant the Board's cross-petition for enforcement of its order.

On two issues, the panel is divided: (1) the NLRB's authority to issue a nonmajority bargaining order; and (2) the requirement that Conair's president personally read the NLRB's remedial notice to an assemblage of employees. Judge Wald, for the reasons stated in her dissenting opinion,

would enforce the Board's bargaining order. For the reasons stated in Part V.C of this opinion, written by Judge Wald, the court upholds the Board on the presidential reading issue. Judge Ginsburg dissents on this issue; she would allow Conair's president, if he so elects, to designate a responsible officer to read the remedial notice on his behalf.

## I. BACKGROUND

Conair is engaged in the manufacture, sale, and distribution of hair care, personal grooming, and related products. At all times relevant to this controversy, Conair maintained its administrative offices, conducted warehousing and distributional operations, and produced electrical hair care appliances at the Company's facility in Edison, New Jersey. 261 NLRB at 1203–04.[4] When the events at issue occurred, the Edison plant employed 300 unit workers. *Id.* at 1285 n. 451.[5] Most of these employees, it appears, were Spanish speaking. *Id.* at 1208 n. 31, 1268 n. 369.

In March of 1977,[6] the Union began an organizational campaign at Conair's Edison plant. *Id.* at 1205. In early April, shortly after becoming aware of the Union's campaign, the Company conducted a series of unprecedented management-employee meetings in direct response to the Union's efforts. *Id.* at 1262, 1265. Conair Vice-Presidents John Mayorek and Jerry Kampel held a meeting for all unit employees in the plant's cafeteria on April 4. *Id.* at 1205. At that meeting, Mayorek indicated that

---

**3.** Subsequent to the ALJ's decision, the Third Circuit held in *United Dairy Farmers Coop. Ass'n v. NLRB,* 633 F.2d 1054 (3d Cir.1980), that the NLRB had the authority to issue a nonmajority bargaining order to remedy "outrageous" and "pervasive" employer unfair labor practices. The Board issued such an order on remand in that case. *See United Dairy Farmers Coop. Ass'n,* 257 NLRB 772 (1981).

**4.** As set out *infra* pp. 1367–68, we reject Conair's challenge to the credibility determinations and findings of fact made by the ALJ, and affirmed by the Board. We therefore summarize the ALJ's factfindings in this background statement. Citations to 261 NLRB in Part I refer to the ALJ's opinion, rather than the

Board's opinion, unless otherwise indicated by the context.

**5.** As described by the ALJ, the bargaining unit included:

All production and maintenance employees including shipping and receiving employees, warehouse employees, truck drivers and janitorial maintenance employees ... at [the] Edison plant, but excluding all office clerical employees, plant clerical employees, professional employees, guards and supervisors as defined in the [National Labor Relations] Act. 261 NLRB at 1259–60.

**6.** All events described herein occurred during 1977, unless otherwise noted.

the Company knew of the organizational campaign. He then pointed out the benefits provided by the Company in the past, *id.* at 1205–08, cautioned that certain current benefits would be lost with unionization, *id.* at 1205–08, 1267,[7] and promised that in the future the Company would provide a variety of benefits—many directly responsive to employee complaints aired at the meeting. *Id.* at 1205–08, 1264 & n. 351, 1272.[8] Mayorek further informed the employees that the Company had an "open-door" policy—previously unknown to most, if not all, employees—whereby they could bring grievances directly to managerial personnel.[9] This direct access to management also would be lost with unionization, he warned. *Id.* at 1205–08, 1262–63. Kampel reiterated much of what Mayorek said. *Id.* at 1208, 1267, 1272.[10]

On April 6, Conair President Leandro Rizzuto addressed a second mass meeting of unit employees held in the production area. His remarks tracked the earlier remarks of Mayorek and Kampel. President Rizzuto stated that he could not understand why the employees would want to unionize; he then recited current benefits, cautioned that unionization would result in the loss of certain benefits,[11] and promised various additional benefits in the future. *Id.* at 1210–12, 1267–68, 1273.[12] Rizzuto warned that if he had to pay the increased wages the Union would demand, he would go out of business. *Id.* at 1210–12, 1267–68. He also stressed that, without a union, employees were free to bring complaints directly to supervisory and managerial personnel; with a union, he said, someone would have to represent workers before management, resulting in delay. *Id.* at 1211–12, 1267–68.

Later that same day, Rizzuto, Mayorek and Kampel held several meetings with groups of ten to fifteen employees during which they again spoke of current and future benefits, and of the "open-door" policy. Rizzuto stated at the small group sessions that if a union came in, it would be cheaper to move to Hong Kong than to remain in Edison. *Id.* at 1214–15, 1268, 1273.[13] Kampel promised to deal with several employee complaints aired at these meetings. *Id.* at 1214–15, 1273.[14]

In response to Conair's extraordinary management-employee meetings, the Union called an unfair labor practice strike on the

7. Mayorek stated that only nonunion employees could participate in Conair's profit sharing plan, and that the Union would provide a health insurance plan inferior to the plan Conair offered. 261 NLRB at 1268.

8. Mayorek promised an improved wage and benefits package, the hiring of a bilingual personnel director to deal with worker complaints, installation of a new water fountain, and expansion of the cafeteria to provide hot and cold meals. *Id.* at 1272. All but the last of these promised benefits answered complaints employees expressed at the meeting. *Id.* at 1264 & n. 351.

9. The ALJ doubted that Conair had an "open-door" policy prior to the April 4 meeting. *Id.* at 1262–63.

10. An interpreter translated Mayorek's and Kampel's remarks into Spanish. Conair similarly provided Spanish translations of the remarks made at the April 6 mass meeting described below. *Id.* at 1206, 1210.

11. These included the profit sharing plan and Christmas parties and gifts. *Id.* at 1267–68.

12. In addition to the benefits promised on April 4, *see supra* note 8, Rizzuto promised that the security guard's negative attitude toward the employees, of which they had complained, would change. *Id.* at 1273.

13. At the time Rizzuto spoke of moving, Conair already participated as a joint venturer in a Hong Kong production facility for electrical hair care appliances. *Id.* at 1204.

14. Kampel promised to provide gloves to protect assembly-line workers' hands and to investigate the allegedly unfair discharge of a worker. *Id.* at 1216, 1273.

In contacts with small groups or individual employees, various supervisory personnel reiterated points Conair officials had made at the early April meetings. *See id.* at 1267 (closing of plant and moving to Hong Kong if Union comes in); *id.* at 1273 (promise of new wage package). Supervisory personnel also interrogated two employees about their union activities during this period. *Id.* at 1275.

morning of April 11. *Id.* at 1217, 1277.[15] Approximately 125–140 unit employees participated in the strike that morning,[16] and over 100 remained at the plant to picket. *Id.* at 1218, 1277. The strike continued for over five months, ending on September 23. Disorganized picketing and numerous spontaneous acts of picket line violence [17] marked the first two days. *Id.* at 1219–26, 1287.[18] Thereafter, apart from a few incidents during the week of July 18,[19] no significant picket line misconduct occurred. *Id.* at 1287.[20]

On April 13, the Union initiated two administrative actions: it petitioned the Board for certification as unit representative, J.A. 579a–80a; [21] and it filed an unfair labor practice charge against Conair based on the early April meetings. J.A. 271a–72a. The Union and the Company then entered into a stipulation to hold a consent election among all unit employees on Conair's payroll as of April 9. J.A. 581a–83a.[22] This election, originally scheduled for May 6, was postponed on May 5 pending resolution of an unfair labor practice charge (based on the early picket line violence) the Company had filed with the Board on April 25. 261 NLRB at 1202 n. 1; J.A. 280a–81a.[23]

■ During the course of the strike, the Company repeatedly made it clear to the striking employees that persistence in the concerted action would result in loss of their jobs. On April 20, Conair sent mailgrams to the strikers stating that they

---

**15.** On April 6, 25–30 unit employees went to the Union hall to report on the various meetings. Some of these employees asked for return of their authorization cards, stating that they did not want to lose their jobs. The Union assured them that Conair's actions had been illegal and the next day told a meeting of 50–60 unit employees that they could strike to protest the Company's actions. Upon receiving an enthusiastic response from the assembled employees, and thereafter further exploring its options, the Union resolved to call the strike. *Id.* at 1217, 1277.

**16.** Approximately 100 unit employees remained away from work and participated in picketing during the entire strike. *Id.* at 1217 n. 73.

**17.** These included rock and bottle throwing, tire slashing, name calling, threats against nonstriking workers, minor injuries to nonstrikers, damage to the nonstrikers' automobiles, and damage to plant property. *Id.* at 1287.

**18.** On April 13, Conair secured a state court injunction (consented to by the Union, J.A. 306a) limiting the Union to a total of 10 pickets and forbidding the pickets from interfering with employees or vehicles seeking entry into or exit from the plant. J.A. 273a–75a. This injunction was vacated on May 16. J.A. 591a–92a. Conair obtained a second, similar injunction on July 21 that remained in effect until the end of the strike. J.A. 301a–03a, 319a–21a.

**19.** The primary incident occurred during the evening of July 21 when a Roadway Express driver arrived at the Conair plant in his personal vehicle and without any evident business purpose. A Union official struck the driver with a tire jack during an argument apparently over the picketers' previous treatment of an-

other Roadway Express driver. 261 NLRB at 1232–36 & n. 172.

During the course of the strike a series of fires occurred at the Edison plant and one night the windows of the executive offices were blown out by a shot-gun. No evidence established the Union's complicity in these acts, however. *Id.* at 1227 & n. 133, 1287 & n. 464.

**20.** The ALJ based this finding in part on the extensive videotapes Conair made of the picketers from approximately April 13 or 14 until the end of the strike. *Id.* at 1276, 1287 n. 465.

**21.** As of April 13, at least 124 workers had signed cards authorizing the Union to "act exclusively as [their] agent and representative for the purpose of collective bargaining." *Id.* at 1205; J.A. 413a. The Union eventually obtained another 14 authorization cards. 261 NLRB at 1205.

**22.** *See* NLRB Statements of Procedure, 29 C.F.R. § 101.19(b) (1983). The stipulation provided that Local 102, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters), which had intervened, would also be listed on the ballot. 261 NLRB at 1205; J.A. 581a–82a; *see* NLRB Casehandling Manual (Part II: Representation Proceedings) § 11022.3(d) (1975).

**23.** When an unfair labor practice charge that might affect the outcome of an election is filed shortly before the election and the NLRB finds that the charge has prima facie merit, the usual course is to postpone the election pending resolution of the charge or waiver by the charging party of its right to challenge the election on the basis of the charged conduct. *See Supremant Mfg. Co. v. Alpert,* 318 F.2d 396, 397 (1st Cir.1963).

would be deemed to have quit their jobs unless they reported to work on April 22. 261 NLRB at 1237–38, 1268; J.A. 453a.[24] Conair subsequently sent each striker a letter dated June 9 which, in the Spanish version,[25] offered "full and immediate reinstatement . . . if you accept unconditionally our offer to return to work." 261 NLRB at 1238–39 & n. 216, 1268; J.A. 452a.[26] Finally, Conair sent letters to the strikers in July or August stating in English and Spanish that the Company had notified the insurance carriers for the employees' medical and life insurance plans that the strikers no longer worked for Conair. 261 NLRB at 1239, 1268 & n. 371; J.A. 484a.[27]

**24.** The mailgrams stated in full in both Spanish and English:

WE HAVE CALLED YOU REPEATEDLY TO YOUR JOB. DESPITE YOUR PROMISES TO DO SO, YOU HAVE FAILED TO REPORT FOR DUTY. THERE IS NO VIOLENCE, EMPLOYEES FREELY ENTER THE PLANT. UNLESS YOU REPORT TO WORK ON FRIDAY APRIL 22 1977 AT YOUR REGULAR STARTING TIME YOU WILL BE DEEMED TO HAVE VOLUNTARILY QUIT YOUR JOB.

261 NLRB at 1237–38; J.A. 453a. The Union filed an unfair labor practice charge against Conair on May 19 alleging that the mailgrams threatened a discriminatory discharge and that the employees were so discharged as of April 22. J.A. 285a.

**25.** The ALJ concluded that 75–80% of Conair's employees were Spanish speaking and noted that 79% of the 1977 strikers have Spanish surnames. 261 NLRB at 1268 n. 369.

**26.** The letter stated in full in the Spanish version:

OUR TELEGRAM OF APRIL 20, 1977, IS HEREBY RESCINDED. YOU ARE HEREBY OFFERED FULL AND IMMEDIATE REINSTATEMENT TO YOUR FORMER JOB OR, IF YOUR JOB NO LONGER EXISTS, TO A SUBSTANTIALLY EQUIVALENT POSITION, *IF YOU ACCEPT UNCONDITIONALLY OUR OFFER TO RETURN TO WORK.*

261 NLRB at 1238–39 & n. 216; J.A. 452a (emphasis added). The English version replaced the italicized portion with "upon your unconditional offer to return to work." An employer has an obligation to reinstate unfair labor practice strikers who express their willingness to return to work. *See, e.g., Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956); *Teamsters Local 115 v. NLRB,* 640 F.2d 392, 394 (D.C. Cir.), *cert. denied,* 454 U.S. 837, 102 S.Ct. 141,

Meanwhile, inside the plant, the Company persisted in its efforts to eliminate unrest among its nonstriking employees.[28] Conair officials, both at meetings and in remarks to individual employees, continued to encourage workers to voice to management any grievances they might have. 261 NLRB at 1226, 1257 & n. 371, 1262, 1265; J.A. 2328a. A bilingual personnel director, promised by Mayorek on April 4, commenced employment at the Edison plant on June 1. 261 NLRB at 1238. Thereafter, the Company planned and implemented a variety of benefits[29]—many in response to employee complaints raised during the early April meetings. *Id.* at 1246–48, 1274 & n. 392.[30]

70 L.Ed.2d 118 (1981); *Jimmy Dean Meat Co.,* 227 NLRB 1012, 1032 (1977).

**27.** The letters stated in full in both Spanish and English:

Dear Employee:

You have been requested on two occasions within the last three months, to report to work and you have failed to do so. Under our medical and life insurance policies, "Cessation of active service in a class of employees eligible for insurance shall be deemed termination of employment." Consequently, we have advised the insurance companies that you are not working for Conair.

You must also recognize that all accrued vacation benefits have been suspended and all forms will be mailed to you within 30 days.

261 NLRB at 1239; J.A. 484a. One insurance company sent the strikers letters notifying them that they were no longer covered because Conair had terminated their employment on the ground that they had "left [their] job[s]." 261 NLRB at 1239, 1268 & n. 371.

**28.** Throughout the strike Conair posted three large signs outside its plant stating in effect that Conair employees were not on strike. 261 NLRB at 1226, 1269. The ALJ concluded, in light of Conair's other actions, that these signs conveyed to the strikers the message that they were no longer considered by the Company as employees. *Id.* at 1269.

**29.** On April 7, prior to the strike, Conair for the first time gave Easter gifts to its employees. *Id.* at 1216, 1274.

**30.** Sometime between June 1 and the end of the strike the Company established a system for promoting current employees by bidding for jobs, *id.* at 1247; set up salary standards and performance ratings, *id.* at 1247–48; began a

After a spring and summer of concerted action, the Union informed Conair that the strike would end on September 23; on behalf of all striking employees, the Union made an unconditional offer to return to work on that day. *Id.* at 1240, 1277. The Company accepted the offer but refused to reinstate the strikers immediately.[31] Instead, when the strikers reported to the plant on September 28, the Company required them to fill out job applications. *Id.* at 1240–41, 1278. During the period from October 4 to November 7, most of the strikers received reinstatement offers[32] and returned to work. *Id.* at 1241, 1279.[33] Conair initially offered five strikers jobs less desir-

able than the ones they held before the strike, however, and never offered reinstatement to thirteen strikers.[34]

On November 23, the Board approved a formal settlement of the unfair labor practice charges Conair had filed alleging picket line misconduct by the Union. J.A. 362a–66a.[35] The representation election initially scheduled for May 6 was thereafter rescheduled for December 7. 261 NLRB at 1202 n. 1. During the two weeks prior to the vote, supervisory personnel repeatedly stated to various unit employees that Conair's president would close the Edison plant and move to Hong Kong if the Union won the election. *Id.* at 1248–51, 1269.[36]

---

newsletter, *id.* at 1248; and allocated parking spaces by seniority, *id.* In addition, sometime between June 1 and the representation election, the Company expanded the cafeteria to provide hot food, *id.* at 1246–47; instituted formal termination and layoff procedures, *id.* at 1247; established an employee credit union, *id.* at 1248; organized employee social clubs, *id.;* improved safety procedures, *id.;* hired a bilingual nurse, *id.;* gave employees a holiday on their birthdays, *id.;* provided an extra drinking fountain in the production area, *id.* at 1274; and supplied gloves to the women on the assembly line, *id.*

Despite promises, Conair presented no new wage package during the strike or prior to the election. On numerous occasions during the strike, Conair officials explained to the nonstriking employees that it would be illegal to offer such a package before Conair's labor problems were solved. *Id.* at 1226 & n. 126, 1273.

**31.** The Union responded to this refusal by filing another unfair labor practice charge. J.A. 341a–42a.

**32.** Conair made the offers by means of a mailgram written in English only and mailed a scant one to four days prior to the date on which the employee had to report for work in order to accept. 261 NLRB at 1241, 1278.

**33.** Upon returning to work, the strikers had to fill out new tax and insurance forms. The Company wrote "new hire" on many of the returning strikers' time cards and replaced the original date of hire on several strikers' attendance records with the return date. *Id.* at 1241–42, 1279.

**34.** The Company refused to offer reinstatement to four employees who were arrested on the picket line and pled guilty to obstructing passage of a motor vehicle, *id.* at 1242–43, 1279–

80, one employee who was arrested outside the plant and pled guilty to loitering, *id.* at 1242–43, 1281, and five employees who had responded to the June 9 letter but later rejoined the strike, *id.* at 1243–44, 1281. Conair mailed offers of reinstatement to two strikers at incorrect addresses, and failed to send an offer to one striker. When these errors were brought to Conair's attention, the Company refused to correct them. *Id.* Further, Conair discharged three reinstated strikers who had taken authorized leave. *Id.* at 1244–46, 1281–82. The Union filed unfair labor practice charges protesting these discharges. J.A. 367a–69a.

**35.** This settlement required the Union to cease and desist from any further picket line misconduct and to post a notice of the settlement for 60 days. J.A. 364a.

Conair's original April 25 charge against the Union had been informally settled on May 12. J.A. 282a. The Board's Regional Director withdrew his prior approval of the settlement and issued a complaint on August 25, after the Company filed a second unfair labor practice charge alleging further Union violence. J.A. 322a–31a. The Union and the General Counsel reached a formal settlement on September 1, J.A. 332a–40a, but Conair objected because, inter alia, the Union did not admit guilt in the stipulation. J.A. 362a n. 1.

**36.** Supervisors had made similar statements to unit employees in October. 261 NLRB at 1248–49. Moreover, at a mass meeting for unit employees held on October 26, President Rizzuto warned that no company can give what the Union promised and still remain in business. *Id.* at 1271. Rizzuto also stated during the October 26 meeting that the Company could not spell out its future plans for improved benefits because the Union would object to the Board. *Id.* at 1273. Once again, he pointed to the Company's "open-door" policy. *Id.* at 1265.

Supervisors also warned on several occasions that, in the event of a Union victory, the employees would not receive their Christmas bonuses. *Id.* at 1250, 1253–54, 1270. "Raffle tickets" inundated the plant warning that a vote for the Union was a vote for plant closure. *Id.* at 1251–53, 1269–70.[37] Finally, Conair distributed campaign literature (printed in both Spanish and English, *id.* at 1254) and "Statements of Account" declaring that the Company's profit sharing plan was for nonunion employees only. *Id.* at 1254, 1270.

The Union lost the December 7 election by a vote of 136 to 69;[38] eight votes were cast for the Teamsters[39] and forty-one ballots were challenged. J.A. 583a–84a. On March 8, 1978, the Board's Regional Director filed a complaint in which he consolidated the Union's challenge to the election with allegations drawn from the various unfair labor practice charges the Union had filed against Conair. 261 NLRB at 1202 & n. 2; J.A. 370a–93a.[40]

Hearings on the Regional Director's complaint ran for thirty-eight days, commencing on March 23, 1978, and ending on June 2, 1978. 261 NLRB at 1202 & n. 4. On July 30, 1980, the ALJ issued his decision and recommended order. J.A. 260a. The ALJ determined that Conair had violated section 8(a)(1) of the NLRA[41] by soliciting employee grievances during an organizational campaign through means more elaborate than previously used and with the promise (expressed or implied) that reported grievances would be adjusted, 261 NLRB at 1266–67; by threatening its employees with loss of current benefits if they supported a union, *id.* at 1270–71; by threatening its employees with plant closure if they supported a union, *id.* at 1269–70; by threatening to discharge its employees for engaging in protected concerted action, *id.* at 1268–69; by promising (expressly or impliedly) and granting benefits to induce its employees to renounce unionization, *id.* at 1273–75; by coercively interrogating several employees concerning their union activities, *id.* at 1275–76; and by creating the impression that its employees' union activities were under surveillance, *id.* at 1276. *See id.* at 1288. The ALJ further determined that Conair's disadvantageous treatment of unfair labor practice strikers, based on their union activities, was unlawful under both section 8(a)(1) and section 8(a)(3) of the NLRA.[42] In this category of violations, the ALJ included the Company's failure to reinstate the strikers immediately upon their unconditional offer to return to work, *id.* at 1279; its failure initially to reinstate five strikers to positions substantially equivalent to their pre-strike jobs, *id.* at 1279; its failure ever to reinstate thirteen strikers, *id.* at 1281; and its discharge of three previously reinstated strikers, *id* at 1282. *See id.* at 1288. Conair's 8(a)(1) and 8(a)(3) violations, the ALJ concluded, were sufficiently grave and numerous to place the Company's conduct within the "outrageous" and "pervasive" category described by the Supreme Court in *Gissel. Id.* at 1285.

The ALJ's recommended order directed Conair to cease and desist from the enumer-

---

**37.** These tickets stated in relevant part:

WIN AN EXCITING ALL EXPENSE PAID TRIP TO CONAIR'S NEW FACILITIES IN BEAUTIFUL HONG KONG. DONATION: ONE UNION VOTE

*Id.* at 1251. There is evidence linking the Company to the distribution of these "raffle tickets." *Id.* at 1251, 1269–70.

**38.** The electorate consisted of the 300 unit employees on Conair's payroll as of April 9. *Id.* at 1259–61, 1285 n. 451.

**39.** The Teamsters withdrew from the proceedings on December 19, 1977. J.A. 583a n. 2.

**40.** This complaint amended several prior complaints. *See* J.A. 286a–93a, 345a–61a, 370a–93a; *infra* pp. 1369–70.

**41.** Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of rights the NLRA accords them.

**42.** Section 8(a)(3), 29 U.S.C. § 158(a)(3) (1976), bars encouraging or discouraging membership in any labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment."

ated unfair labor practices and from violating section 8(a)(1) in any other manner,[43] and to implement extraordinary notice and access remedies. *Id.* at 1283, 1285.[44] The ALJ declined to recommend a bargaining order, however, because the Union never had obtained authorization cards from a majority of the unit employees[45] and the Board, at the time of the ALJ's decision, had never issued a nonmajority bargaining order. *Id.* at 1284–85 & n. 451.

The full Board generally affirmed the ALJ's findings and proposed remedies. *Id.* at 1189–92; *id.* at 1195 & n. 28 (Chairman Van de Water); *id.* at 1199 (Member Hunter).[46] By a divided vote, the Board also imposed a bargaining order retroactive to April 4, 1977—the date Conair began its campaign of unfair labor practices. *Id.* at 1192–94.[47] Finally, the Board majority concluded that the April 20 mailgram resulted in the actual discharge of the striking employees on April 22—and thus Conair was liable for back pay to the strikers from that date until the end of the strike. *Id.* at 1189–90 & n. 5.

**43.** The ALJ's proposed order called upon the Company to reinstate with back pay all strikers refused reinstatement or initially recalled and later discharged. His order also awarded back pay to all strikers whose reinstatement was delayed. 261 NLRB at 1283; J.A. 263a–64a.

**44.** These remedies required Conair to:
(1) Mail a notice of the remedial order (in both Spanish and English) to all current and former employees, place the notice in appropriate company publications, and have President Rizzuto read the notice to all current employees;
(2) publish the notice in local newspapers for four weeks;
(3) for two years grant the Union reasonable access to plant bulletin boards, upon request;
(4) for two years grant the Union reasonable access to nonwork areas of the plant during the employees' nonwork time, upon request;
(5) supply the Union, upon a request made within one year, the names and addresses of current employees;
(6) for two years give the Union notice of any speeches made by the Company to its employees concerning unionization, and equal time and facilities to respond thereto; and
(7) for two years give the Union the right to deliver a 30-minute speech to the employees on

## II. THRESHOLD ISSUES

Conair initially raises two objections and contends that each of them warrants a decision vacating the Board's order in its entirety. The Company argues first, that the timing of the representation election among unit employees contravened NLRB policy and regulations; and second, that credibility assessments along with a host of other findings made by the ALJ, and adopted by the Board, lack foundation in the record. Both objections are insubstantial.

### A. Timing of the Representation Election

On September 1, 1977, the Union and the Board's General Counsel reached a formal settlement of the unfair labor practice charges alleging picket line misconduct by the Union. J.A. 332a–40a. A term of the settlement required the Union to post a remedial notice at its offices for sixty days. J.A. 335a–36a. The Board approved this settlement, over Conair's objections, on November 23, 1977. J.A. 362a–65a. The representation election was then held on December 7, 1977. J.A. 583a.

The election occurred several weeks too soon, Conair maintains, because the Union's

working time prior to any Board election in which the Union will participate.
261 NLRB at 1285.

**45.** The Union's 138 cards represented 46% of the 300 unit employees. *Id.* at 1285 n. 451.

**46.** Chairman Van de Water dissented from the Board's affirmation of the requirement that President Rizzuto himself read the remedial notice to the current employees. *Id.* at 1196 n. 28.

**47.** Three Board members voted to impose a bargaining order. Only two of these members, however, concluded that the order should be retroactive to April 4; one member of the majority voted that it be prospective only. *Id.* at 1194 & n. 24. Two members who opposed the bargaining order in this case nonetheless believe that NLRB bargaining orders generally should be retroactive. We therefore accept NLRB counsel's representation to this court that the bargaining order the Board imposed on Conair is retroactive to April 4, 1977. *See* NLRB Response to the Court's Interrogatories and Supplemental Brief at 1–3 (August 5, 1983) (citing cases).

misconduct had destroyed "laboratory conditions," and the Board's own regulations indicate that such conditions could not be restored until expiration of the sixty-day posting period. We note first that it is not altogether clear that NLRB policy called for a sixty-day wait in this case. More importantly, the error, if there was one, was harmless.

NLRB regulations do provide that, "except in exceptional circumstances, no *election* should be held until the posting period has expired." [48] But "exceptional circumstances" may be present here. Almost all of the Union's misconduct occurred on April 11 and 12, 1977—eight months prior to the December 7, 1977 election date. 261 NLRB at 1219–26, 1287 (ALJ Opinion). The remaining incidents of misconduct occurred during the week of July 18, 1977—four and one-half months prior to the election. *Id.* at 1287. Moreover, the strike ended on September 23, 1977; there had not even been a picket line for two and one-half months prior to the election. *See id.* at 1240, 1277–78. It would not have been unreasonable, under these circumstances, for the NLRB to conclude that any effects of the Union's picket line misconduct had dissipated prior to December 7, 1977.[49]

In any event, Conair's argument fails on a practical ground. We do not comprehend how a Board-held election arguably tainted by Union misconduct harmed Conair when the Union lost that election. Thus, even if the NLRB should have deferred the election date until sixty days after the Union posted the remedial notice, Conair is not positioned to complain. Scheduling the election during the period the *Union* was required to post a cease and desist notice did not reduce the force of the *Company's* unfair labor practices at which the Board's order is directed.

## B. *Substantial Evidence Supports the ALJ's Findings*

Conair's attack on the ALJ's findings do not merit extended discussion. The Company insistently urges that we overturn the ALJ's credibility determinations. Our review of the record confirms that we have no cause to do so.

The ALJ stated that, in general, he credited the testimony of the General Counsel's witnesses over the testimony of the Company's witnesses. *Id.* at 1265.[50] There is nothing inherently arbitrary, we note, in believing one side's witnesses and not the other's. *See Bruce Duncan Co. v. NLRB,* 590 F.2d 1304, 1309 (4th Cir.1979); *cf. UAW v. NLRB,* 455 F.2d 1357, 1368–69 & n. 12 (D.C.Cir.1971) (resolving all factual conflicts in favor of one party does not establish bias of ALJ).[51] We find no tena-

---

**48.** The relevant regulation states that, upon the settlement of unfair labor practice charges blocking an election, the processing of the election petition may proceed. "However, except in exceptional circumstances, no *election* should be held until the posting period has expired" unless the charging party waives its right to challenge the election on the ground that the posting period had not expired. NLRB Casehandling Manual (Part II: Representation Proceedings) § 11730.8 (1975) (emphasis in original). Conair never executed a waiver. Opening Brief of Petitioner and Cross-Respondent at 32.

**49.** An agency, of course, should observe its own regulations, *see, e.g., Gardner v. FCC,* 530 F.2d 1086, 1089 (D.C.Cir.1976), and the cloudy position of the NLRB on the election-timing issue suggests that the Board's rules on holding elections during posting periods or while charges are outstanding bear clarification.

**50.** The ALJ observed that the testimony of the General Counsel's witnesses was "in large measure given in a forthright manner, was more detailed, generally unequivocal and clear, corroborative and consistent in nature with each other, and most importantly apparently consistent with the other evidence present in the record"; the testimony of the Company's witnesses, on the other hand, was "for the most part contradictory, evasive, guarded and quite defensive, at times unclear and equivocal, and in some instances of such an incredible nature as to be unworthy of belief." 261 NLRB at 1255. *See id.* at 1266 & n. 358 (additional reasons for not crediting testimony of Vice-President Mayorek).

**51.** The charge that the ALJ without exception disbelieved Conair's witnesses is less than fully accurate. For example, in concluding that strikers engaged in misconduct during the first two days of the strike, the ALJ credited testi-

ble basis for assigning to the ALJ's credibility calls in this case less weight than we generally accord such assessments. *See, e.g., Local Union No. 984, IBEW v. NLRB,* 697 F.2d 113, 117 (6th Cir.1982); *NLRB v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 100–01 (2d Cir.1982). His appraisals are neither "hopelessly incredible" nor "self-contradictory." We therefore uphold them. *See, e.g., NLRB v. S.E. Nichols, Inc.,* 704 F.2d 921, 923 (6th Cir.1983) (uphold unless "lack[ing] a rational basis"); *Mead Corp. v. NLRB,* 697 F.2d 1013, 1022 (11th Cir.1983) (uphold unless "inherently unreasonable or self-contradictory"); *NLRB v. American Geri-Care, Inc.,* 697 F.2d 56, 60 (2d Cir.1982) (uphold unless "hopelessly incredible"), *cert. denied,* —— U.S. ——, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983); *Boston Mutual Life Insurance Co. v. NLRB,* 692 F.2d 169, 170 (1st Cir.1982) (uphold unless beyond "the bounds of reason"); *see also Retail, Wholesale & Department Store Union v. NLRB,* 466 F.2d 380, 386–87 (D.C.Cir.1972) (NLRB finding based on testimony of two witnesses, although contradicted by testimony of a third witness, affirmed because testimony relied on was not "hopelessly incredible").

■ Conair also contends that many of the ALJ's findings are not supported by substantial evidence because they ignore

mony of Company witnesses. *Compare id.* at 1218–19 & n. 80 *with id.* at 1219–26.

52. *See* Opening Brief of Petitioner and Cross-Respondent at 47–50, 52–53 (examples a, b, d, e & k).

53. For similar reasons we reject Conair's assertions that the ALJ mischaracterized credited evidence, *see* Opening Brief of Petitioner and Cross-Respondent at 46–47, 50–55 ("Wahler incident" and examples f, g, j & l), and reached conclusions based on insufficient evidence, *see id.* at 49, 52, 55–56 (examples c, h, m & n). *See Midwest Regional Joint Bd., Amalgamated Clothing Workers v. NLRB,* 564 F.2d 434, 438 (D.C.Cir.1977) ("Our function is not to overturn the Board's choice between two equally plausible inferences from the facts if the choice is reasonable....").

54. As earlier noted, § 8(a)(1), 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of rights the NLRA accords them.

contrary evidence given by credited General Counsel witnesses. We have reviewed each of the examples cited by the Company [52] and reject Conair's contention. At most, Conair has an argument that in each case rational triers of fact might have drawn conflicting conclusions from the testimony. Under such circumstances, this court has no authority to upset the conclusions reached by the ALJ and the Board. *See, e.g., NLRB v. Concord Furniture Industries, Inc.,* 675 F.2d 426, 428 (1st Cir.1982); *Kenworth Trucks, Inc. v. NLRB,* 580 F.2d 55, 59 (3rd Cir.1978).[53]

### III. The April 20, 1977 Mailgram: Threatened or Actual Discharge

■ By a three to two vote, the Board held that one of the ALJ's conclusions of law did not reach far enough. The ALJ had determined that Conair's April 20, 1977, mailgram to striking employees *threatened* discharge in violation of section 8(a)(1) of the NLRA (hereafter, § 8(a)(1)).[54] The Board's majority decided that the mailgram violated section 8(a)(3) of the NLRA (hereafter, § 8(a)(3)) as well,[55] because it amounted to more than a threat; it in fact terminated the strikers' employment as of April 22, 1977.[56] We hold that Conair was

55. As earlier noted, § 8(a)(3), 29 U.S.C. § 158(a)(3), bars encouraging or discouraging membership in any labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment."

56. Actual discharge of unfair labor practice strikers not only violates § 8(a)(1) by "interfer[ing] with, restrain[ing], or coerc[ing] employees" in the exercise of their right to engage in protected concerted activity, it also discourages union membership by "discriminati[ng] in regard to hire or tenure of employment" in violation of § 8(a)(3).

The Board's modification of the ALJ's decision dramatically increased Conair's back pay liability. The Union, by letter and mailgram dated September 21, 1977, notified Conair of the strikers' unconditional offer to return to work as of September 23, 1977. 261 NLRB at 1277–78 (ALJ Opinion). A company has a five-day period to reinstate nondischarged unfair labor practice strikers once an unconditional offer to return is made. *See* Drug Package Co.,

not afforded timely notice that the issue presented by the mailgram was actual, not merely threatened, discharge. Accordingly, we reverse the Board's determination that the mailgram episode violated § 8(a)(3).

## A. *Background*

On April 20, 1977, Conair sent a mailgram to each of its striking employees, stating in both English and Spanish: .

WE HAVE CALLED YOU REPEATEDLY TO RETURN TO YOUR JOB. DESPITE YOUR PROMISES TO DO SO, YOU HAVE FAILED TO REPORT FOR DUTY. THERE IS NO VIOLENCE, EMPLOYEES FREELY ENTER THE PLANT. UNLESS YOU REPORT FOR WORK ON FRIDAY APRIL 22 1977 AT YOUR REGULAR STARTING TIME YOU WILL BE DEEMED TO HAVE VOLUNTARILY QUIT YOUR JOB.

J.A. 453a. No striking employees reported . to work in response to this mailgram. *See* 261 NLRB at 1238 (ALJ Opinion). The

Union asserted, in an unfair labor practice charge filed against Conair on May 19, 1977,[57] that the mailgram episode violated § 8(a)(1) and § 8(a)(3). J.A. 285a. Specifically, the Union charged:

On or about April 20, 1977, and continuing to date, [Conair], by its officers and agents, *threatened its employees with discharge, and on April 22 discharged said employees,* because of their activities on behalf of Local 222, ILGWU, . . . and for their protected concerted activities. The foregoing employees consisted of those employees who have supported and are supporting the strike called by Local 222.

J.A. 285a (emphasis added).

The first official unfair labor practice complaint was lodged against Conair by the Board's Regional Director on May 31, 1977.[58] It covered unfair labor practices charged by the Union prior to May 19, 1977, and therefore did not include any reference to the mailgram. A statement concerning

---

228 NLRB 108, 113–14 (1977). The ALJ therefore concluded Conair violated § 8(a)(1) and § 8(a)(3) when, five days after the unconditional offer was made (September 26, 1977), the Company had not reinstated anyone. 261 NLRB at 1279 (ALJ Opinion). Eighty-one strikers were reinstated from October 4, 1977 to November 7, 1977. The ALJ's proposed order required Conair to make whole those striking employees for wages lost during the period from September 26, 1977, to "the date of a bona fide offer of reinstatement by [Conair], or their actual reinstatement as the case may be." *Id.* at 1283.

Actually discharged unfair labor practice strikers, however, are entitled to back pay from the date of discharge—even absent an unconditional offer on their part to return to work. *See* Abilities and Goodwill, Inc., 241 NLRB 27, 27–28 (1979). The Board's modification of the ALJ's decision therefore moved the date when the back pay obligation commenced from September 26, 1977, to April 22, 1977. Thus the Board's order adds over five months to Conair's back pay obligation to each unfair labor practice striker.

**57.** The Union filed six separate unfair labor practice charges against Conair during and shortly after its organizing campaign. The first charge, Case No. 22–CA–7586, was filed on April 13, 1977. J.A. 271a–72a. On the same day, the Union also filed a petition for certification of representation in Case No. 22–RC–7119. J.A. 579a–80a. The second charge, Case No.

22–CA–7672, involving the mailgram allegation, was filed on May 19, 1977. J.A. 285a. The NLRB Regional Director's initial complaint, filed on May 31, 1977, alleged only those violations contained in the first charge by the Union. *See* J.A. 286a–93a.

The Union filed the third charge in Case No. 22–CA–7939 on September 29, 1977, J.A. 341a–42a; the Acting Regional Director's first amended complaint, filed on November 11, 1977, consolidated the first three Union charges and, for the first time, contained allegations about the mailgram controversy. *See* J.A. 345a–61a. Three additional charges, in Case Nos. 22–CA–8173, 22–CA–8220, and 22–CA–8238, were filed by the Union on January 26, February 21, and February 24, 1978, respectively. J.A. 367a–69a. The Regional Director's second amended complaint, issued March 8, 1978, consolidated the six charges and the representation petition for hearing. J.A. 370a–93a.

**58.** The General Counsel is authorized by § 3(d) of the NLRA, 29 U.S.C. § 153(d), to file unfair labor practice complaints. The Regional Director, as agent for the Board in a particular region, 29 C.F.R. § 102.5 (1983), has authority to issue complaints where it appears an unfair labor practice charge has merit. *See* 29 C.F.R. §§ 102.15, 102.74 (1983). If the Regional Director declines to file a complaint, the charging party may appeal this decision to the General Counsel. 29 C.F.R. § 102.19 (1983).

the mailgram episode appeared, initially, in the Acting Regional Director's first amended complaint against Conair, issued on November 11, 1977. J.A. 345a–61a. That pleading alleged: "On or about April 20, 1977, at its Edison plant, [Conair] did *threaten its employees with loss of employment* if they continued to support the Union or any other labor organization." J.A. 350a (emphasis added).

Notably, the Acting Regional Director's pleading did not incorporate the Union's charge that employees were in fact discharged by reason of the mailgram. Matching its confinement of the allegation to "threaten[ed] . . . loss of employment," the first amended complaint cited only § 8(a)(1), not § 8(a)(3), in this context. J.A. 360a. As to other unfair labor practices identified in the pleading, however, the complaint asserted that both provisions, § 8(a)(1) and § 8(a)(3), had been violated. *See* J.A. 353a–58a, 360a.

A second amended complaint issued on March 8, 1978. J.A. 370a–93a. It added new allegations, *see, e.g.,* J.A. 376a, 385a–86a, but repeated verbatim the mailgram charge as set out in the first amended complaint. J.A. 377a. Again, the pleading stated that the mailgram incident violated § 8(a)(1); no § 8(a)(3) charge was asserted in relation to this incident. J.A. 391a. Further, as the ALJ noted, "at the commencement of the hearing [before the ALJ] and during the course thereof the second amended complaint was amended at various times by counsel for the General Counsel to include additional allegations of violations . . . by [Conair]." 261 NLRB at 1202. None of these further amendments to the second amended complaint alleged actual discharge of strikers in violation of § 8(a)(3). *See* General Counsel Exhibit 1(cc)–(hh).

At the hearing before the ALJ, Conair Vice-President Mayorek testified that he knew of no striking employees who returned to work in response to the April 20 mailgram, J.A. 1485a, and that as of April 22, 1977, the striking employees were considered "[t]o have voluntarily quit their jobs." J.A. 1486a. Referring to this testimony and to the content of the April 20 mailgram, the ALJ concluded that the mailgram expressly threatened discharge in violation of § 8(a)(1). 261 NLRB at 1268. Nothing in the ALJ's comprehensive decision, issued in July 1980, however, indicates as an issue in controversy the question whether the April 20, 1977, mailgram occasioned actual discharges in violation of § 8(a)(1) and § 8(a)(3). By contrast, in instances where the complaint alleged conduct in violation of § 8(a)(3), and the evidence supported the allegation, the ALJ concluded that § 8(a)(3) had been violated. *See, e.g., id.* at 1278 n. 417, 1279, 1281.

In exceptions to the ALJ's decision, the Board's General Counsel asserted that the Judge erred by:

[f]ailing to find that [Conair] violated Section 8(a)(1) and (3) of the Act by discharging all of its unfair labor practice strikers as of April 22, 1977, and by failing to provide an appropriate remedy in connection therewith.

General Counsel's Exceptions to the Decision of the Administrative Law Judge at 2 (November 14, 1980).[59] The Union filed a similar exception, and specifically asserted that Conair should have been ordered "to make all of the [affected] unfair labor prac-

---

**59.** This exception first appeared in the record in the Counsel for the General Counsel's Memorandum in Opposition to the Proposed Settlement Agreement at 5, dated October 18, 1979. In September 1979, over a year after the hearing before the ALJ closed, Conair and the Union negotiated a settlement that included a provision stating that Conair would not be liable for back pay. Opposing the settlement, the General Counsel stated his view that Conair owed the unfair labor practice strikers back pay from April 22, 1977, until their reinstate-

ment. Ultimately, the settlement agreement collapsed.

The General Counsel's cryptic reference in October 1979 to the issue stated with precision in his November 1980 exceptions does not indicate timely notice to Conair; although the ALJ's opinion did not issue until July 1980, the hearing ended on June 2, 1978. Notice adequate to provide a fair opportunity to defend must occur before, not after, the record is closed.

tice strikers ... whole for any loss of pay commencing April 22, 1977 until the date of a bona fide offer of reinstatement." Charging Party's Exceptions to the Decision of the Administrative Law Judge at 2 (November 7, 1980).

The Board unanimously affirmed the ALJ's determination that the mailgram unlawfully threatened striking employees with discharge in violation of § 8(a)(1). We agree that the record fully supports the ALJ's conclusion, and Conair does not seriously argue otherwise. Three of the Board's five members, however, further determined that the ALJ's conclusion should be augmented in line with the exception pressed by the General Counsel and the Union; these members cited record evidence supporting the contention "that the April 20 mailgram also violated Section 8(a)(3) and (1) of the Act by unlawfully terminating the striking employees." 261 NLRB at 1189–90.

Conair, in its brief responding to the General Counsel's and Union's exception, had objected that the pleadings failed to alert it to the presence of an actual termination issue stemming from the mailgram. The Board's majority declared as its answer to this lack of notice objection:

> Although [Conair] asserts that it had no notice that the April 20 mailgram would be litigated as a violation of Sec. 8(a)(3), the complaint specifically alleges that the mailgram threatened employees with discharge in violation of Sec. 8(a)(1), and *other paragraphs of the complaint allege that other conduct by [Conair] violated Sec. 8(a)(3)*. Further, in its exceptions, [Conair] argued that the law and the interpretation of the facts now in the record do not support the finding of a violation. [Conair] does not argue that it was precluded from adducing any exculpatory facts or that it would have altered its presentation of the case in any manner. Accordingly, we find no merit to [Conair's] contentions since the issue was fully litigated and all of the operative facts underlying the finding of a 8(a)(3) and (1) violation are present in the record.

261 NLRB at 1190 n. 5 (citing *Southern Newspapers, Inc.,* 255 NLRB 154, 154 n. 1 (1981)) (emphasis added).

Board Member Hunter, joined by Chairman Van de Water, dissented from the majority's extension of the ALJ's decision on the mailgram episode. They reasoned:

> [T]he discharge issue was initially raised in the [Union's] charge but was not alleged as an unfair labor practice in the [Regional Director's] complaint, [thus leading Conair] to believe that the discharge issue was not before the Board. Sec. 3(d) of the Act vests the authority to issue unfair labor practice complaints with the General Counsel, and in this case the General Counsel saw fit not to allege that the mailgram had violated the Act by unlawfully discharging [Conair's] striking employees.... [T]his is not the type of case where, during the hearing, the General Counsel discovers previously unavailable evidence indicating additional unfair labor practices.... [T]he General Counsel had long been aware of the existence of the mailgram.... [I]t is patently unfair to permit the General Counsel to raise the discharge issue at such a late stage, and after the record has been closed.... [W]e can only speculate as to how [Conair] might have changed its litigation strategy or presented its facts differently if the discharge issue, with its substantial backpay liability, had been timely raised. Once the record has been closed, and, if you will, all bets called, it is too late to raise the ante and attempt to collect additional chips.

261 NLRB at 1199 n. 39.

### B. *Analysis*

We agree with the dissenting Board members that the critical issue is not whether there is substantial evidence in the record indicating that the mailgram occasioned actual termination of the strikers' employment. That issue, we believe, should not have been reached by the Board, for Conair was never told before the hearing record closed that the stakes included liability for discharges effected on April 22, 1977.

The Union opened the matter by charging that the mailgram episode spelled discharge, and not the mere threat of such action. But the complaint adjudicated by the ALJ, although amended in several particulars both before and during the course of the hearing, never asserted more than the threat of termination in violation of § 8(a)(1). And the ALJ, who canvassed the case thoroughly in an extraordinarily detailed decision, apparently did not regard actual discharge as a matter fairly posed for resolution.

It will not do to assert, as the Board's majority did, that "other paragraphs of the complaint allege[d] that other conduct by [Conair] violated Sec. 8(a)(3)." 261 NLRB at 1190 n. 5. If anything, such "other paragraphs" might have reinforced Conair's anticipation that it faced only an § 8(a)(1), not an § 8(a)(3), contention in relation to the mailgram. Nor do we believe it was Conair's burden to show that, had it been accorded due notice of an actual discharge claim based on the mailgram, it could have "adduc[ed] ... facts" or "altered its presentation" to defeat the claim. *See id.* Here, as in *McLean-Behm Steel Erectors, Inc. v. Occupational Safety and Health Review Commission,* 608 F.2d 580, 582 (5th Cir.1979), "because the record ... does not reveal uncontrovertibly that petitioner could not have prevailed in any defense to [the 8(a)(3) ] charge, we find prejudice requiring reversal." [60]

We stress that we do not rest on the notion that the NLRB's General Counsel is rigidly bound by his initial statement of a complaint or even his successively amended pleadings. Rule 15(b) of the Federal Rules of Civil Procedure provides an apt analogy. Under Rule 15(b), pleadings can be amended to conform to the evidence, even after judgment, when "issues not raised [therein] are tried by express or implied consent of the parties." FED.R.CIV.P. 15(b). Indeed, formal amendment is unnecessary to preserve the result of a fair trial of an issue

that the parties in fact have agreed to litigate. But it must be "clear that the parties understand exactly what the issues are when the proceedings are had." *Kuhn v. Civil Aeronautics Board,* 183 F.2d 839, 842 (D.C.Cir.1950).

Further, the presence of evidence in the record to support a charge unstated in a complaint or any amendment thereto does not mean the party against whom the charge is made had notice that the issue was being litigated. "[T]he introduction of evidence relevant to an issue already in the case may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue." *Cioffe v. Morris,* 676 F.2d 539, 542 (11th Cir.1982) (quoting *International Harvester Credit Corp. v. East Coast Truck,* 547 F.2d 888, 890 (5th Cir.1977)).

Because it is the "[a]ctuality of notice ..., not the technicality, [that] govern[s]," *Kuhn v. Civil Aeronautics Board,* 183 F.2d at 842, pleading amendments may be tendered on appellate review. *See* 6 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1494, at 476–78 (1971). But "if the record is incomplete or if it is uncertain whether the party opposing the motion to amend had notice of the unpleaded issue at the trial stage, the appellate court should render its decision in conformity with the issues relied upon by the lower court in reaching its judgment." *Id.* at 478.

It is at least uncertain whether Conair had fair notice or understood that the discharge issue was part of the case tendered to the ALJ. The ALJ, who did not even mention the issue in an otherwise exhaustive set of findings and conclusions, evidently did not perceive that the question had been tried "by express or implied consent." *See* FED.R.CIV.P. 15(b). Under the circumstances presented here, the Board, acting as an appellate body, should have

---

**60.** *See Jimenez v. Tuna Vessel "Granada",* 652 F.2d 415, 420 (5th Cir.1981) ("[E]ach party is entitled to know what is being tried, or at least to the means to find out. Notice remains a

first-reader element of procedural due process, and trial by ambush is no[t] ... favored ....").

"render[ed] its decision in conformity with the issue[ ]" as framed and resolved by the ALJ. *See* 6 C. WRIGHT & A. MILLER, *supra,* at 478. We conclude, for the reasons stated, that the Board erred in "finding that [Conair] violated Section 8(a)(3) and (1) of the Act by discriminatorily discharging its striking employees on April 22, 1977," 261 NLRB at 1190, and in modifying the ALJ's proposed remedy to conform to that Board finding.

## IV. CONAIR ENGAGED IN "OUTRAGEOUS" AND "PERVASIVE" UNFAIR LABOR PRACTICES NOT OFFSET BY UNION MISCONDUCT

Two determinations underlie the Board's remedial directives: first, a fair election could not be held in the wake of Conair's "outrageous" and "pervasive" violations of the NLRA; second, the Union did not engage in sufficiently grave misconduct to preclude the issuance of any bargaining order that might otherwise be appropriate. The evidence credited in the administrative proceedings,[61] and prior NLRB and court decisions, support both determinations. Neither is vulnerable under the deferential standard of review we apply when the Board engages in a reasoned exercise of its expert judgment. *See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 615–16, 89 S.Ct. 1918, 1939 n. 32, 1940–41, 23 L.Ed.2d 547 (1969); *Amalgamated Clothing*

*Workers v. NLRB,* 527 F.2d 803, 807 (D.C. Cir.1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

### A. *Conair's Conduct*

The ALJ concluded that "the extensive unfair labor practices committed by [Conair] . . . are so 'outrageous' and 'pervasive' as to . . . render[ ] impossible a fair election." 261 NLRB at 1285. The NLRB accepted the ALJ's conclusion[62] as congruent with the Board's analysis of Conair's conduct in terms of four variables: the gravity of the Company's violations, the extent to which their coercive effect pervaded the bargaining unit, their timing, and the degree to which Conair repeated them.[63]

The Board referred first to the gravely coercive nature of Conair's unfair labor practices, stressing the Company's threats to close the plant and its reprisals against striking employees. *Id.* at 1192.[64] Next, the Board noted that the Company's violations were constantly repeated. Further, the Board observed that the unlawful practices began at a high level of intensity shortly after the Union's organizational drive commenced, continued over an eight month period, intensified as the election neared, and even occurred several times after the election. *Id.* at 1193. Finally, the

---

**61.** *See supra* pp. 1360–62.

**62.** Member Hunter disagreed; in his opinion extraordinary notice and access provisions would provide an adequate remedy. 261 NLRB at 1199. Chairman Van de Water's position on this issue is unclear. *See id.* at 1195.

**63.** These variables derive from the NLRB's decision in United Dairy Farmers Coop. Ass'n, 257 NLRB 772, 773–75 (1981) [hereafter, *United Dairy II*], the only other case in which the Board has ordered an employer to bargain with a union that never obtained even a card majority. *See* 261 NLRB at 1192 (Board Opinion). The *United Dairy II* decision also identified a history of employer misconduct as relevant to determining whether a fair election is possible. *See United Dairy II,* 257 NLRB at 773. The Board acknowledged the absence of evidence in the instant case that the Company engaged in unfair labor practices prior to the events at issue. *See* 261 NLRB at 1192 n. 16.

**64.** The Board pointed to the threats to discharge the striking employees, the refusal to reinstate certain strikers, the delay in reinstating the other strikers, the subsequent discharge of several reinstated strikers, and the threats to close the plant as the most coercive of Conair's numerous violations. *See* 261 NLRB at 1192–93.

The Board majority also emphasized its determination that the April 20 mailgram resulted in the actual discharge of all striking employees on April 22. *See id.* at 1192. We have rejected that determination because it was made without fair notice to Conair. *See supra* pp. 1368–73. We do not regard the "actual discharge" determination as critical, however, *cf. Pedro's, Inc. v. NLRB,* 652 F.2d 1005, 1011–12 (D.C.Cir. 1981), because the Board majority concluded in the alternative that Conair's conduct precluded a fair election even if the Company did not discharge all the striking employees on April 22. *See* 261 NLRB at 1193 n. 18.

Board cited the conspicuous involvement of Conair's highest officials and the use of mass meetings and publications as factors serving to insure that the coercive impact pervaded the bargaining unit. *Id.* The confluence of factors thus identified by the Board is undergirded by substantial evidence on the record as a whole, *see, e.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Pedro's, Inc. v. NLRB,* 652 F.2d 1005, 1011 (D.C.Cir.1981),[65] and adequately justifies the conclusion that Conair's conduct fell into the most egregious category.

Prior NLRB and court decisions sustain the Board's judgment as to the character and impact of Conair's conduct. Precedent acknowledges the gravity of threats to close a plant. *See, e.g., Sinclair Co. v. NLRB,* 395 U.S. 575, 588–89, 611 n. 31, 615, 89 S.Ct. 1918, 1926–27, 1938 n. 31, 1940 (1969) (threats of plant closure alone provide sufficient justification for majority bargaining order); *Donn Products, Inc. v. NLRB,* 613 F.2d 162, 166 (6th Cir.) (plant closure is one of the most coercive threats company can make during an election), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Chemvet Laboratories, Inc. v. NLRB,* 497 F.2d 445, 448 (8th Cir.1974) (same); *Wright Plastic Products, Inc.,* 247 NLRB 635, 635 (1980) (same); *Rapid Manufacturing Co.,* 239 NLRB 465, 466 (1978) (same), *enforcement denied in part,* 612 F.2d 144 (3d Cir.1979). Reprisals against union proponents are similarly recognized as highly coercive. *See, e.g., Jim Baker Trucking Co.,* 241 NLRB 121, 122 (1979) ("threat of termination is a serious unfair labor practice, [and] the effectuation of such a threat is even more serious"), *enforced mem.,* 626 F.2d 866 (9th Cir.1980); *cf. First Lakewood Associates v. NLRB,* 582 F.2d 416, 424 n. 5 (7th Cir.1978) (it is generally but not universally true that "section 8(a)(1) violations are less serious and have less residual impact than . . . section 8(a)(3) violations"). The numerosity of § 8(a)(1) violations has figured prominently as well

in estimating the coercive impact of an employer's unlawful anti-union activities. *See United Oil Manufacturing Co. v. NLRB,* 672 F.2d 1208, 1213 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); *NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 1003 (10th Cir. 1977); *Jim Baker Trucking Co., supra; see also NLRB v. Ely's Foods, Inc.,* 656 F.2d 290 (8th Cir.1981) (majority bargaining order upheld where employer committed only § 8(a)(1) violations).

■ Case law further recognizes that the possibility of a fair rerun election is reduced when high corporate officials participate in the unfair labor practices, *see, e.g., Rapid Manufacturing Co. v. NLRB,* 612 F.2d 144, 149 (3d Cir.1979); *Wright Plastic Products, Inc.,* 247 NLRB 635, 635 (1980), and when the violations affect most of the unit employees. *See, e.g., Electrical Products Division of Midland-Ross Corp. v. NLRB,* 617 F.2d 977, 987 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); *NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 1003 (10th Cir. 1977). Repetition of unfair labor practices, practical judgment suggests, reinforces their coercive effect. *See also NLRB v. Fort Vancouver Plywood Co.,* 604 F.2d 596, 601 (9th Cir.1979) ("[r]epeated and drastic nature of the coercive behavior" warrants majority bargaining order as remedy), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

Two additional considerations fortify our view that we have no cause in this case to second guess the NLRB's expert appraisal of the quality and effects of Conair's unlawful activities. First, this case in several respects is similar to the one other case in which the Board concluded a nonmajority bargaining order was necessary because an employer's "outrageous" and "pervasive" unfair labor practices precluded a fair return election (*United Dairy Farmers Coop-*

---

**65.** *See supra* pp. 1367–68 (ALJ's findings underlying the factors identified by the Board are supported by substantial evidence).

*erative Association,* 257 NLRB 722 (1981)),[66] and it is distinguishable from cases in which the Board did not reach that conclusion.[67] *Cf. NLRB v. Jamaica Towing, Inc.,* 602 F.2d 1100, 1104–05 (2d Cir.1979) (one reason for remand is Board's failure to explain apparent inconsistency of issuing a bargaining order when Board had not issued such an order in similar cases). Second, Conair's misconduct was more "outrageous" and "pervasive" than the misconduct demonstrated in other cases in which this court affirmed the Board's decision to issue a majority bargaining order because prospects for a fair rerun election appeared dim. *See Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 681 F.2d 11, 24 (D.C.Cir.1982) (no threats of plant closure, no threat of losing benefits, no solicitation of grievances, no promises or grants of benefits, fewer threats of discharge), *cert. denied,* —— U.S. ——, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983);

*Amalgamated Clothing Workers v. NLRB,* 527 F.2d 803, 806–07 (D.C.Cir.1975) (no § 8(a)(3) violations, no threats of discharge, no solicitation of grievances, no interrogations, no impression of surveillance, no threat to withdraw benefits, fewer promises and grants of benefits), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); *Southwest Regional Joint Board, Amalgamated Clothing Workers v. NLRB,* 441 F.2d 1027, 1034–35 (D.C.Cir.1970) (no threats of plant closure, no threats of discharge, no solicitation of grievances, no impression of surveillance, no involvement by company president, fewer § 8(a)(3) violations, fewer promises and grants of benefits, and fewer threats to withdraw benefits).[68]

## B. The Union's Misconduct

 It is not disputed that, on three days in the course of the five and one-half

**66.** *United Dairy II* differs from this case in that the employer there had a prior history of unfair labor practices, discharged over 20% of the bargaining unit (including the primary union activist), and even threatened physical violence on a single occasion. However, the two cases have these common features: in both, the company president (as well as others) repeatedly threatened discharges and plant closure; the company actually discharged employees, granted benefits, coercively interrogated employees, and created the impression of surveillance; the company responded swiftly and severely to the beginning of the unionization drive and continued committing unfair labor practices over an extended period; and in both cases the coercive message was effectively spread throughout the bargaining unit. Moreover, unlike the employer in *United Dairy II,* Conair also engaged in extensive solicitation of employee grievances, threatened to terminate a variety of employee benefits, and delayed reinstatement of unfair labor practice strikers. *Compare United Dairy II,* 257 NLRB at 772–74 *with* Part I, *supra* pp. 1360–1361.

The NLRB has found "outrageous" and "pervasive" employer misconduct in other cases. See, e.g., Sambo's Restaurant, Inc., 247 NLRB 777, 777 (1980), *enforced,* 641 F.2d 794 (9th Cir.1981). The Board decided these cases, however, when it did not yet claim the authority to issue nonmajority bargaining orders to remedy such conduct. Consequently, it is not clear that the Board analyzed the situations presented with the rigor necessary to determine whether a nonmajority bargaining order, if within the Board's remedial authority at all,

is appropriate. *See* Lankford, *Nonmajority Bargaining Orders: A Study in Indecision,* 46 ALBANY L.REV. 363, 395 (1982).

**67.** *See* Belcher Towing Co., 265 NLRB No. 159, slip op. (1982) (although company was a recidivist, there were no discharges, mass threats of discharge, or threats of plant closure; company president did not personally participate in unfair labor practices; unionization effort occasioned no immediate response; and fewer nondischarge § 8(a)(3) violations occurred); Paul Distributing Co., 264 NLRB No. 179, slip op. (1982) (although two of seven unit employees were discharged, company recalled union activist five days later; no threats were made to the unit en masse; and individual threats made three days after discovery of the unionization effort were not repeated thereafter); United Supermarkets, Inc., 261 NLRB 1291 (1982) (unfair labor practices subsided several months prior to election; company did not communicate threats en masse; high level officials did not make threats; and geographical separation of bargaining unit members diffused coercive impact); Fred Lewis Carpets, Inc., 260 NLRB 843 (1982) (no solicitation of grievances, or surveillance; and company committed all violations on single day).

**68.** This court also approved a majority bargaining order in *Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 445 F.2d 237, 246–47 (D.C. Cir.1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972), a case involving numerous and sustained highly coercive unlawful practices.

month long strike, significant episodes of striker violence occurred. Picketing was massive and disorganized on the opening days, April 11 and 12. Employees attempting to cross the picket line encountered pushing and shoving. Uncontrolled strikers threw rocks, obstructed traffic, slashed tires, and smashed windshields. Several workers sustained minor injuries. These chaotic incidents, the ALJ found, were not Union-planned. *See* 261 NLRB at 1219–26, 1287 nn. 453, 456.

On the evening of July 21, the arrival of a truck at Conair's premises for no apparent business reason occasioned a further violent incident. The truck driver was assaulted and his truck was damaged. *See id.* at 1232–36.

The ALJ determined from the testimony that "victims" provoked some of the strikers' misconduct and that Conair's own unlawful activities created a "volatile situation." *See id.* at 1287 n. 456. He further found that, following the chaotic first two days of the strike, violence subsided. *See id.* In the long stretch from April to September, the ALJ concluded, the "strike was generally conducted in a peaceful manner with no significant picket line misconduct." *Id.* at 1287.[69]

We do not decide in this case whether, as a general rule, grave union misconduct, even if offset by more egregious employer misconduct, precludes Board imposition of a remedial bargaining order. *Compare NLRB v. Triumph Curing Center,* 571 F.2d 462, 476 (9th Cir.1978), *and Donovan v. NLRB,* 520 F.2d 1316, 1321 (2d Cir.1975) (in deciding propriety of majority bargaining order Board should balance "effect of the Company's violations against the gravity of the Union's misconduct"), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976), *with* Note, *Union Violence & Bargaining Orders: A New Approach to* Laura Modes, 127 U.PA.L.REV. 1640, 1658–65 (1979) (advocating exclusive focus on gravity of union misconduct).[70] We address only the circumstances at hand: when a strike is generally peaceful, marred only by outbursts of violence contained within a short span and not traced to union direction, we are not prepared to declare the Board's issuance of an otherwise appropriate bargaining order an abuse of discretion.

## V. REMEDIES

For the reasons stated in Part III, *supra,* we decline to enforce the portion of the Board's "make whole" directives predicated upon the alleged discharge of strikers on

---

69. On review of the record, we concluded that substantial evidence supports the ALJ findings underlying these observations. *See supra* pp. 1367–68.

70. For the Board's five-factor balancing approach to the problem, see Maywood Plant of Grede Plastics, 235 NLRB 363, 365 (1978).

The Board has declined to issue majority bargaining orders when the union's misconduct was considerably more serious, and the employer's considerably less grave, than the misconduct demonstrated in this case. *See* Allou Distribs., Inc., 201 NLRB 47 (1973) (six union agents entered plant and then deliberately threatened and intimidated all ten unit employees until they withdrew decertification petition; employer violated § 8(a)(1) and § 8(a)(5) by soliciting decertification petition, promising improved benefits, and refusing to bargain); Aircraft Mantel & Fireplace Co., 174 NLRB 737 (1969) (union deliberately engaged in extended campaign of intimidation and property damage; employer violated § 8(a)(5) by refusing to bargain); Laura Modes Co., 144 NLRB 1592 (1963) (union representatives beat one partner inside plant, "pushed around" employee trying to call

police, and on a later date beat another partner outside plant; employer violated § 8(a)(1) and § 8(a)(5) by coercively interrogating employees, threatening discharge, soliciting employees to withdraw from union, and refusing to bargain).

For court rulings refusing to enforce majority bargaining orders after union misconduct, see NLRB v. World Carpets, 463 F.2d 57 (2d Cir. 1972) (picketers threatened nonstrikers with sticks and chased plant managers in cars; low level supervisor on one occasion promised employees a benefit and on another stated that company president would close warehouse rather than accept union); NLRB v. United Mineral & Chemical Corp., 391 F.2d 829 (2d Cir.1968) (union representative and numerous pickets grabbed one employee, knocked another to ground, and beat owner so severely that he required over five months hospitalization; employer violated § 8(a)(1) and § 8(a)(3) by discharging one employee, creating the impression of surveillance, and soliciting an employee to engage in surveillance).

April 22, 1977.[71] We explain below why, despite our acceptance of the Board's evaluation of Conair's conduct as "outrageous" and "pervasive," we reject the Board's nonmajority bargaining order remedy. In all other respects, we uphold the Board's remedial order. We divide our discussion of the Board-imposed remedies into three parts: (1) the bargaining order; (2) extraordinary notice and access remedies generally; (3) the requirement that Conair's president personally read the Board's remedial notice to an assembly of current employees.[72]

## A. The Nonmajority Bargaining Order

In 1980, for the first time in the long history of the NLRA,[73] a court squarely held that the NLRB has the authority to issue a bargaining order despite the absence of tangible evidence that the union ever secured the support of a majority of the affected employees.[74] The full Board itself did not rule unequivocally on the question until 1982, in the case at hand.[75] The issue is vexing[76] because it trenches upon employee freedom of choice, a matter at the very center of our national labor relations

**71.** Other "make whole" directives require Conair to: (1) reinstate all discriminatorily discharged strikers with appropriate back pay awards computed from the day of their unconditional offer to return to work; (2) make whole all previously reinstated strikers for any loss of pay resulting from the Company's discriminatory delay in reinstating them after their unconditional offer to return to work; and (3) rehire all strikers reinstated after the strike but subsequently discharged, with appropriate back pay awards. *See* 261 NLRB at 1195 (Board Opinion); *id.* at 1283, 1289 (ALJ Opinion). These requirements are unquestionably within the Board's broad remedial power. *See generally Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 187–200, 61 S.Ct. 845, 849–855, 85 L.Ed. 1271 (1941).

**72.** As stated earlier, *supra* p. 1360, our positions diverge on the Board directives listed above first and third. Judge Ginsburg and Judge Scalia hold that the Board lacks authority to issue a nonmajority bargaining order; Judge Wald would enforce the Board's bargaining order for the reasons stated in her dissenting opinion. Judge Wald and Judge Scalia, for the reasons set out by Judge Wald in Part V.C of this opinion, uphold the Board's presidential reading directive; Judge Ginsburg dissents on this issue.

**73.** The Act has been in effect since 1935. *See* National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151–169 (1976)).

**74.** *United Dairy Farmers Coop. Ass'n v. NLRB,* 633 F.2d 1054 (3d Cir.1980); *cf. NLRB v. Empire Corp.,* 518 F.2d 860, 863 n. 3 (6th Cir.1975) (stating in dictum that "[i]t is clear that the Board may, where it finds egregious unfair labor practices, enter a bargaining order even though the union is unable to demonstrate that it represents a majority") (citations omitted); *J.P. Stevens & Co. v. NLRB,* 441 F.2d 514, 521–22 (5th Cir.1971) (strongly suggesting same in dictum). A panel of this court, although leaving the question open because the

case before it did not require resolution of the "conundrum ... even preliminarily," noted that it "d[id] not share [the Third Circuit panel's] confidence that the Board's [general remedial] authority is so broad" as to embrace the power to order an employer to bargain with a union that has not concretely demonstrated majority support. *Teamsters Local 115 v. NLRB,* 640 F.2d 392, 397 n. 7, 398 (D.C.Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).

**75.** The remand in *United Dairy, supra,* was disposed of by a panel consisting of only three of the five Board members. Two of these adhered to their earlier position that the NLRB possesses authority to issue a nonmajority bargaining order; the third "recognized the Third Circuit's decision as binding upon the Board for the purpose of deciding that case." Conair Corp., 261 NLRB 1189, 1191 n. 14 (1982) (discussing *United Dairy II* ). Thus, a majority of the Board has never, until this case, issued a nonmajority order on the basis of its own assessment that it has authority to do so.

**76.** Commentary, while generally favoring nonmajority bargaining orders in egregious cases, is far from unanimous. *Compare* Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 HARV.L.REV. 38, 132–39 (1964), Golub, *The Propriety of Issuing* Gissel *Bargaining Orders Where the Union Has Never Attained a Majority,* 29 LAB.L.J. 631 (1978), *and* Note, United Dairy Farmers Cooperative Association: *NLRB Bargaining Orders in the Absence of a Clear Showing of a Pro-Union Majority,* 80 COLUM.L.REV. 840 (1980) (all advocating Board authority to issue nonmajority bargaining orders), *with* Hunter, Conair: *Minority Bargaining Orders Usher in 1984 at NLRB,* 33 LAB.L.J. 571 (1982), Ostan, *Bargaining Orders:* Gissel *and* United Dairy Farmers Revisited, 8 EMPLOYEE REL.L.J. 198 (1982), *and* 49 GEO.WASH. L.REV. 780 (1981) (all questioning Board authority to issue nonmajority bargaining orders).

policy. Nonmajority bargaining orders pose this dilemma: if the Board lacks authority to issue them, employers who offend the law most egregiously will escape the most stringent remedy in the NLRB's arsenal; if the Board has the authority and exercises it to sanction patent and incessant employer unfair labor practices, employees may be saddled for a prolonged period[77] with a union not enjoying majority support.[78] Absent a card majority the Board cannot estimate with any degree of reliability how the employees would have responded in a free election.[79] Inevitably, therefore, a nonmajority bargaining order replaces employee freedom of choice with a government agency's educated guess that the employees will fare better with a union than without one.[80]

77. A union recognized on the basis of a nonmajority bargaining order does not qualify for the one-year protection from decertification and competing union election petitions enjoyed by unions certified in a valid Board election. *See* National Labor Relations Act § 9(c), 29 U.S.C. § 159(c) (1976). However, the Board has consistently held that an employer under order to bargain with a union must do so for *a reasonable time period* (generally one year), without regard to the union's majority status. *See, e.g.,* Keller Plastics E., Inc., 157 NLRB 583, 587 (1966); Poole Foundry and Mach. Co., 95 NLRB 34, 36 (1951). *See also* Franks Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944) ("[A] bargaining relationship once *rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed.*"). Moreover, once the union and employer have signed a *collective bargaining agreement*, the Board's contract bar rules presumably will bar a new election in that bargaining unit for the duration of the agreement, provided it lasts no longer than three years. *See* General Cable Corp., 139 NLRB 1123 (1962).

78. Board members who doubt or deny the NLRB's authority to issue nonmajority bargaining orders have pointed out that employees vote against collective representation in more than half of all Board elections. *See Conair,* 261 NLRB at 1197 & n. 35 (1982) (Chairman Van de Water, concurring in part and dissenting in part) (quoting United Dairy Farmers Coop. Ass'n, 242 NLRB 1026, 1043 n. 65 (1979) (hereafter, *United Dairy I*) (Member Penello, concurring in part and dissenting in part) and citing 1978 and 1980 NLRB annual reports).

On the relationship between union authorization cards and election results, the Fourth Circuit said in *NLRB v. S.S. Logan Packing Co.,* 386 F.2d 562 (4th Cir.1967):

In 1962, Board Chairman McCullock presented to the American Bar Association data indicating some relationship between large card-signing majorities and election results. Unions which presented authorization cards from *thirty to fifty per cent of the employees* won nineteen per cent of the elections; those having authorization cards *from fifty to seventy per cent of the employees* won only forty-eight per cent of the elections, while those having authorization cards from over seventy per cent of the employees won seventy-four per cent of the elections.

*Id.* at 565 (footnote omitted). The Board recently reported that this data has not been updated. *See* Letter from John C. Truesdale, Executive Secretary, NLRB, to Carl L. Taylor, attorney for Chamber of Commerce (Sept. 29, 1982), *reprinted in* Brief of the Chamber of Commerce of the United States as Amicus Curiae at A–1 app.

79. When the union has achieved a card majority, the Board assumes a remedial bargaining order rectifies the employer's illegal conduct by restoring the *status quo ante. See Conair,* 261 NLRB at 1196–97 (Chairman Van de Water, concurring in part and dissenting in part). That assumption cannot be indulged when a majority of the employees has never manifested approval of unionization. *See id.* at 1198 (Member Hunter, concurring in part and dissenting in part) (union election campaigns are "subject to ebb and flow in employee sentiment that as often as not has little to do with conduct, lawful or otherwise, engaged in by one of the parties") (footnote omitted); *cf.* Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA,* 96 HARV.L. REV. 1769, 1786 (1983) (citing W. Dickens, Union Representation Elections: Campaign and Vote 108 (Oct.1980) (unpublished Ph.D. dissertation, Department of Economics, Massachusetts Institute of Technology)) (unions would have won only 46–47% of elections studied if employer had campaigned entirely cleanly); *supra* note 78 (unions lose a majority of elections even when authorization cards have been signed by 50–70% of the affected employees).

80. The Board's majority observed that a substantial card showing, such as the "approximately 46 percent" shown in this case, shored up an NLRB-imposed bargaining order. 261 NLRB at 1194. However, the Board did not deem critical to its issuance of a bargaining order "any ... affirmative showing of a reasonable basis for projecting a union's majority support." *Id. But cf.* Bok, *supra* note 76, at 138 (nonmajority bargaining order remedy should be confined to "cases in which there is a

Nothing now in the text of the governing statute, or in its legislative history, suggests that Congress contemplated general authority in the Board to select or designate a union for employees, a majority of whom never signaled assent to the arrangement. Nor do lower court judges have secure guidance from the Supreme Court on this issue.

To discourage employer lawlessness, arguably the NLRB should be positioned to choose for the employees when the prospect of an untainted election, held within a reasonable time frame, appears remote. We recognize the appeal of the position that a nonmajority bargaining order may be the only potentially effective means to check an employer's unlawful conduct designed to nip a union's organizing campaign in the bud.[81] Nonetheless, we believe that the statutory gap we face is too deep for an agency or court to fill. A fundamental policy choice is at stake: Is it ever appropriate to substitute an agency's "big (even if good) brother" judgment for a majority of employees' express choice of a bargaining representative? That basic decision, we believe, should be left to Congress, as the organ of government accountable to the people for establishing the main lines of our national labor relations policy.

### 1. The *Gissel* dictum

The Supreme Court has not yet confronted a case requiring it to decide whether the NLRB has the power to issue a bargaining order where the union has not shown majority status. In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 613–14, 89 S.Ct. 1918, 1939–40, 23 L.Ed.2d 547 (1969), however, the High Court, citing dictum from *NLRB v. S.S. Logan Packing Co.,* 386 F.2d 562, 570 (4th Cir.1967), appeared to contemplate the possibility of such an order.

*Gissel* itself reversed a Fourth Circuit decision which had refused to sanction a bargaining order despite serious employer misconduct and in face of proof that the union had once obtained authorization cards from a majority of employees.[82] The Court observed, nonetheless, that its views and those of the Fourth Circuit were not far apart:

> [T]he actual area of disagreement between our position here and that of the Fourth Circuit is not large as a practical matter. While refusing to validate the general use of a bargaining order in reliance on cards, the Fourth Circuit nevertheless left open the possibility of imposing a bargaining order, *without need of inquiry into majority status on the basis of cards or otherwise,* in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. Such an order would be an appropriate remedy for those practices, the court noted, if they are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had."

*Gissel,* 395 U.S. at 613–14, 89 S.Ct. at 1939–40 (quoting *Logan Packing,* 386 F.2d at 570) (emphasis added).

As the Supreme Court recognized, the Fourth Circuit's decisions in both *Gissel* and *Logan Packing* generally disfavored remedial bargaining orders. Indeed, the *Logan Packing* dictum indicated the Fourth Circuit's uncertainty whether a nonmajority bargaining order could be reconciled with the statute even in the most egregious circumstances: "[I]n light of the guaranty of [NLRA] § 7 of employees' rights not to be represented [the use of a nonmajority bargaining order], *if ever appropriate,* must be reserved for extraordinary cases." 386 F.2d

---

reasonable possibility that the union would have ultimately prevailed in the absence of the employer's unlawful acts"). Instead, "[t]he critical predicate to issuance of a nonmajority bargaining order," the Board reasoned, is its finding that the employer's exceptional conduct has "foreclosed the possibility of a fair representation election." 261 NLRB at 1194.

**81.** *But cf.* Weiler, *supra* note 79, at 1795 (bargaining order imposed by the NLRB years after a union's organizing drive is "highly unlikely" to "produce a viable and enduring collective bargaining relationship").

**82.** Four cases were consolidated for decision in *Gissel;* all four involved card majorities.

at 570–71 (footnote omitted) (emphasis added).

The Supreme Court's *Gissel* dictum, reciting Fourth Circuit dictum, has been read to encompass cases with two characteristics: the employer's conduct falls into the most egregious category; the union's campaign at no point achieved a card majority.[83] Cases with these characteristics are commonly described as *Gissel* "category one" cases.

■ The Supreme Court's holding in *Gissel*, however, is confined to a second category,[84] cases in which the union shows that at one point it had majority employee support:

> The *only* effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser

showing of employer misconduct is appropriate, *we should re-emphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior.* In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that *employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order,* then such an order should issue.

395 U.S. at 614–15, 89 S.Ct. at 1940–41 (emphasis added) (citation omitted). The

---

**83.** *See, e.g., Teamsters Local 115,* 640 F.2d at 396–97.

The Supreme Court's reference in *Gissel* to the possibility of Board-imposed bargaining orders "without need of inquiry into majority status" perhaps has been read to indicate more than the Court intended. Prior to its reference to the Fourth Circuit's *Logan Packing* dictum, the Supreme Court had set out its reasons for disagreeing with the Fourth Circuit's approach "on all major issues," 395 U.S. at 613, 89 S.Ct. at 1939, including that Circuit's distrust of union authorization cards, its view that the 1947 Taft-Hartley amendments had ruled out bargaining orders on the basis of card majorities, and its refusal to accept the Board's *Cumberland Shoe* doctrine. *Id.* at 595–610, 89 S.Ct. at 1930–1938. The Court then softened its multiple rejections of Fourth Circuit positions by pointing out that the Circuit had "left open the possibility" of issuing bargaining orders without inquiry into majority status in sufficiently egregious cases. *Id.* at 613, 89 S.Ct. at 1939; *see Logan Packing,* 386 F.2d at 570 (Board "may have the power" to impose a bargaining order as a remedy for egregious unfair labor practices).

Because *Logan Packing,* in dictum, had raised the possibility of Board-imposed bargaining orders in "exceptional cases" marked by "outrageous" and "pervasive" unfair labor practices, the Supreme Court in *Gissel* was able to say that "the actual area of disagree-

ment between our position here and that of the Fourth Circuit is not large." *Gissel,* 395 U.S. at 613, 89 S.Ct. at 1939. Thus, the High Court's concentration apparently was on the quality of employer conduct *Logan Packing* indicated might justify a bargaining order, not on the notion that such an order could issue "without need of inquiry into majority status."

The probability that the High Court referred only casually to dispensing with inquiry into majority status is heightened by the statement the Court made immediately after it set out the *Logan Packing* dictum:

> The Board itself, we should add, has long had a similar policy of issuing a bargaining order, in the absence of a § 8(a)(5) violation or even a bargaining demand, when that was the only available, effective remedy for substantial unfair labor practices.

*Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940. The Court cited two cases as illustrative of the Board's policy: *United Steelworkers of America v. NLRB,* 376 F.2d 770 (D.C.Cir.1967), and *J.C. Penney Co. v. NLRB,* 384 F.2d 479, 485–86 (10th Cir.1967). Both involved employer misconduct designed to destroy the union's *card majority.*

**84.** A third category *Gissel* mentioned includes violations not serious or extensive enough to warrant a bargaining order because remedies concededly within the Board's authority would adequately ensure a fair election. *See* 395 U.S. at 615, 89 S.Ct. at 1941.

Court thus anchored its holding in *Gissel* to the NLRA's core principle that a majority of employees should be free to accept or reject union representation. A bargaining order in a "category two" case, the Court reasoned, not only "deter[s] employer misbehavior," it "effectuat[es] ascertainable employee free choice."

██ In "category one" cases, by contrast, the employees' free choice is not ascertainable. There is tension between the objective of deterring unfair labor practices and effectuating *expressed* majority sentiment. Dictum reciting dictum, we believe, is not a reliable indicator of the Court's probable view on a tense issue. "[A]ll that can fairly be said [of the *Gissel* dictum] is that the Court left open the issue of whether the Board has the statutory authority to issue a bargaining order in the absence of a showing that the union ever enjoyed majority support."[85] In deciding that issue, the statute itself should be our dominant guide.

2. The Act's twin pillars: freedom of choice and majority rule in employee selection of representatives

██ The Board is charged by section 10(c) of the Act, 29 U.S.C. § 160(c) (1976),

"with the task of devising remedies to effectuate the policies of the Act." *NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953).[86] In performing this task, the Board has wide discretion, subject to limited judicial review. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). A prime function of that limited judicial review, however, is to ensure that the Board's decisions are consistent with the Act's basic premises. *See, e.g., H.K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970) (Board's remedial authority does not include directing an employer to accede to a particular contract clause); *cf. Republic Steel Corp. v. NLRB,* 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940) (Board exceeded its remedial authority in ordering employer to repay government for wages paid to illegally discharged workers because Board is not empowered to vindicate public rights).

Senator Wagner, architect of the original NLRA, said of majority rule:

[D]emocracy in industry must be based upon the same principle as democracy in government. Majority rule, with all its

---

**85.** *United Dairy I,* 242 NLRB at 1040 (Member Penello, concurring in part and dissenting in part), *quoted in Conair,* 261 NLRB at 1196 (Chairman Van de Water, concurring in part and dissenting in part).

Judge Wald suggests that in *Sinclair,* one of the four cases the *Gissel* opinion resolved, the Supreme Court in fact approved issuance of a bargaining order without inquiry into the union's majority status. *See* Wald dissent at 1392. She apparently reads the Supreme Court's words, "even in the absence of a § 8(a)(5) violation," to mean "without need of inquiry into majority status." We do not comprehend why these statements should be regarded as synonymous. At the time the Court decided *Gissel,* Board doctrine had it that an employer could in good faith refuse to bargain in face of a union's proffer of a card majority without committing an § 8(a)(5) violation. *See, e.g.,* Aaron Bros. Co., 158 NLRB 1077 (1966). Thus, an § 8(a)(5) violation required a card majority *plus* something more—employer bad faith in rejecting a bargaining request. When the *Gissel* Court, in discussing *Sinclair,* said a bargaining order could issue "even in the absence of a § 8(a)(5) violation" it likely meant the employer's bad faith in refusing to bargain,

not the union's card majority, could be dispensed with. Supporting this interpretation is the sentence immediately following the ones quoted in Judge Wald's dissent in which the Court explicitly referred to "the union's majority." 395 U.S. at 615, 89 S.Ct. at 1941. In short, the point that the union in *Sinclair* had once achieved majority support was not an item merely raised in stating the facts of the case, *id.* at 589, 89 S.Ct. at 1927, only to be thereafter set aside as irrelevant.

While the Supreme Court's discussion of *Sinclair* is less than crisp, we doubt that more is fairly extractable from the High Court's words than this: if the employer engaged in sufficiently egregious coercive practices and the union once had majority support, then even if the employer's grave offenses do not include a § 8(a)(5) violation, a bargaining order may issue forthwith, *i.e.,* without further Board exploration of prospects for an untainted rerun election in the foreseeable future.

**86.** Section 10(c) provides, in relevant part, that "the Board shall ... take such affirmative action ... as will effectuate the policies of the Act." National Labor Relations Act § 10(c), 29 U.S.C. § 160(c) (1976).

imperfections, is the best protection of workers' rights, just as it is the surest guaranty of political liberty that mankind has yet discovered.

79 Cong.Rec. 7571 (1935). For a near half century, the Act has centrally stated:

Representatives designated or selected for the purposes of collective bargaining *by the majority of the employees* in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit. . . .

National Labor Relations Act, ch. 372, § 9(a), 49 Stat. 449, 453 (1935) (codified as amended at 29 U.S.C. § 159(a) (1976)) (emphasis added). The allied freedom of choice principle also received explicit statement from the start:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through *representatives of their own choosing.* . . .

National Labor Relations Act, ch. 372, § 7, 49 Stat. 449, 452 (1935) (codified as amended at 29 U.S.C. § 157 (1976)) (emphasis added).

In 1947, Congress responded to concerns that employees were being pressured into joining unions; it amended section 7 of the Wagner Act to provide, expressly, that employees "shall also have the right to refrain from any or all of such [concerted] activities." Labor Management Relations Act, ch. 120, § 101, 61 Stat. 136, 140 (1947). The House Report made it plain that the legislators sought to preclude the Board from imposing the agency's choice on the employees; instead, the NLRB was to respect and enforce choices—whether for or against a union—made by employees:

A committee amendment assures that when the law states that employees are to have the rights guaranteed in section 7, the Board will be prevented from compelling employees to exercise such rights against their will . . . . In other words, when Congress grants to employees the right to engage in specified activities, it also means to grant them the right to refrain from engaging therein if they do not wish to do so.

H.R.Rep. No. 245, 80th Cong., 1st Sess. 27 (1947). *See also* 93 Cong.Rec. 3425 (1947) (statement of Congressman Hartley) ("This bill guarantees [workers] . . . [t]he right to join with the[ir] fellow workers to select a collective bargaining agent of their own choosing, that is to say, one that is not forced upon them . . . .").

Congress has authorized one exception to the general rule that a union's selection as exclusive bargaining agent requires the advance approval of a majority of the workers. In recognition of the construction industry's unique needs, Congress amended the NLRA in 1959 to validate "prehire" agreements in that industry. *See* Labor-Management Reporting and Disclosure Act of 1959, Pub.L. 86–257, § 705(a), 73 Stat. 519, 545 (codified at 29 U.S.C. § 158(f) (1976)).[87] Section 8(f) of the Act now provides that a construction industry employer does not commit an unfair labor practice by signing a collective bargaining agreement with a union before the union has established majority employee support.[88] With the main rule in plain view,

---

**87.** As explained in the legislative history:

One reason for [allowing construction industry employers to enter into prehire agreements with unions not then representing a majority of employees] is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral.

H.R.Rep. No. 741, 86th Cong., 1st Sess. 19 (1959), U.S.Code Cong. & Admin.News, pp. 2424, 2442, *quoted in NLRB v. Local 103, Inter-*

*national Ass'n of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 348, 98 S.Ct. 651, 659, 54 L.Ed.2d 586 (1978). *See also Jim McNeff, Inc. v. Todd,* —— U.S. ——, ——, ——, 103 S.Ct. 1753, 1755–57, 75 L.Ed.2d 830 (1983) (discussing the general purpose of § 8(f) and Congress' rationale for enacting it).

**88.** [I]t shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged . . . in the building and construction industry with a labor organization of which building and construction employees are members . . .

however, Congress expressly limited the "prehire" agreement exception: section 8(f) denies unions entering such agreements the one-year protection from election petitions accorded certified unions by section 9(c)(3). *See* National Labor Relations Act § 8(f), 29 U.S.C. § 158(f) (1976).

 In harmony with the intention of Congress to permit only a narrow exception to the freedom of choice-majority rule premise, Board precedent underscores the voluntary, voidable character of section 8(f) agreements: an employer who refuses to abide by an § 8(f) agreement does not thereby violate the duty to bargain imposed by section 8(a)(5), *unless the union can demonstrate its majority status. See, e.g., R.J. Smith Construction Co.,* 191 NLRB 693 (1971). *See also NLRB v. Local 103, International Association of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 341, 98 S.Ct. 651, 655, 54 L.Ed.2d 586 (1978) (prehire agreement is voidable "until and unless [the union] attains majority support in the relevant unit"), *quoted in Jim McNeff, Inc. v. Todd,* —— U.S. ——, ——, 103 S.Ct. 1753, 1757, 75 L.Ed.2d 830 (1983). In the same vein, the Supreme Court has ruled that section 8(f) agreements do not shield unions from the Act's restrictions on picketing aimed at coercing an employer into recognizing a union or at pressuring employees into selecting a particular labor organization as its bargaining representative.[89] *See Local 103, International Association of Bridge, Structural & Ornamental Iron Workers, supra; cf. Jim McNeff, Inc. v. Todd,* —— U.S. at —— – ——, 103 S.Ct. at 1757–1759 (emphasizing that section 8(f) must be construed in light of Act's dominant free choice and majority rule principles).

### 3. Nonmajority bargaining orders are not within the NLRB's current remedial discretion

Our national labor relations policy is designed to "effectuat[e] ascertainable employee free choice" and "expressed" majority sentiment. *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940. A nonmajority bargaining order departs from this design. Absent a union election victory or some other concrete manifestation of majority assent to union representation, it is impossible to project the employees' choice reliably; imposition of a bargaining order in these circumstances runs a high risk of opposing the majority's will.[90] Judge Wald points out effectively in dissent that the majority's will may also be frustrated when an employer's unlawful acts have eliminated the prospect of a reliable election. She would substitute for the coercion Conair imposed an opposing coercive force imposed by the government. Without a clear direction from Congress, we are not prepared to recognize administrative authority, or arrogate power to ourselves, to remedy one possible injustice by taking the substantial chance of imposing another.

---

because ... the majority status of such labor organization has not been established under the provisions of section 9 of this Act prior to the making of such an agreement ....
National Labor Relations Act § 8(f), 29 U.S.C. § 158(f) (1976).

Outside the construction industry, an employer who recognizes a union before majority support is demonstrated commits an unfair labor practice even if the employer acted in good faith and the union in fact represented a majority of employees by the time a formal collective bargaining agreement was signed. *See ILGWU v. NLRB,* 366 U.S. 731 (1961) (upholding Board determination that employer violated NLRA §§ 8(a)(1), (2) and that union violated § 8(b)(1)(A)).

**89.** Section 8(b)(7) of the Act provides, in part:

It shall be an unfair labor practice for a labor organization or its agents ... to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees ....
National Labor Relations Act § 8(b)(7), 29 U.S.C. § 158(b)(7) (1976).

**90.** *See supra* notes 78 & 79.

Administrative "expertise," we note, does not appear to command great weight on the question of the Board's statutory authority to issue a nonmajority bargaining order. The NLRB has seen egregious employer conduct on the order of Conair's before. Through decades of administering the Act, however, it issued, on its own initiative, no nonmajority bargaining order in response to an employer's "outrageous" and "pervasive" conduct. It did so, for the very first time, in this case; and it took that action by a bare, one-vote margin.

Today, as in the past, the NLRB is torn over the nonmajority bargaining order issue. The current three-member majority maintains that, in an atmosphere chilled by an employer's egregious anti-union behavior, a nonmajority bargaining order ultimately will enhance employee freedom of choice.[91] Two members maintain, as insistently, that "resolution of the conflict between majority rights and remedial needs" by the issuance of nonmajority bargaining orders is "fraught with danger for employee freedom of choice."[92] The only Supreme Court expression in point is inconclusive. Congress, the one time it authorized employer recognition of a union without a showing of majority employee support, did so within narrow confines.

■ If Congress wishes to add to the construction industry exception and permit the Board to impose nonmajority bargaining orders as a sanction for an employer's flagrantly unlawful anti-union campaign, it may do so with whatever qualifications it deems appropriate to prevent the Board from veering too far from the freedom of choice-majority rule premise. Given the current shape of the statute, however, we believe Congress has not placed nonmajority bargaining orders within the NLRB's remedial discretion.[93] Strong arguments can be made for and against granting the Board the authority in question. Administrators and judges, in our view, should not endeavor to anticipate or preempt debate on and decision of this issue in the political arena.[94]

## B. Extraordinary Notice and Access Remedies Generally

■ We set out earlier,[95] and restate here, a set of extraordinary notice and access provisions included in the Board's remedial order. Notice of Conair's violations and of the Board's cease and desist order, written in both Spanish and English and personally signed by the Company's president, is to be mailed to each employee at his or her home; copies are to be posted on Company premises; the notice is to be included in appropriate Conair publications; and it is to be published twice weekly for four weeks in local newspapers. For two years, Conair is to afford the Union access to Company bulletin boards, and to employees on Company premises in nonwork areas during nonwork time. A current list of employees' names and addresses is to be furnished to the Union. Also for two years, the Union is to be given notice of, and equal time and facilities to respond to, Company speeches to employees concerning union representation. Further, prior to any Board election held within two years in which the Union participates, the Union is

**91.** See Conair, 261 NLRB at 1193, 1194.

**92.** Teamsters Local 115, 640 F.2d at 397 (referring to Member Penello's decision in United Dairy I). See Conair, 261 NLRB at 1197 (Chairman Van de Water, concurring in part and dissenting in part); id. at 1199 (Member Hunter, concurring in part and dissenting in part); United Dairy I, 242 NLRB at 1043 (Member Penello, concurring in part and dissenting in part).

**93.** Cf. H.K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970) (while not overturning Board's ruling that employer violated § 8(a)(5) of the Act by refusing to bargain in good faith over a union-proposed dues checkoff provision, Court rejected as outside Board's remedial authority its order that employer accede to the contract clause in question).

**94.** For well-presented argument that the debate over bargaining orders "is really beside the point," and that the current regulatory framework needs basic reshaping, see Weiler, supra note 79.

**95.** See supra note 44.

to be permitted to deliver a 30-minute speech to employees on Company time. *See* 261 NLRB at 1195; *id.* at 1285 (ALJ Opinion).

The Board has ordered similar measures in several other cases involving pervasive patterns of illegal employer conduct. This court recently reviewed and upheld an almost identical set of provisions in *Teamsters Local 115 v. NLRB*, 640 F.2d 392 (D.C. Cir.), *cert. denied*, 454 U.S. 837, 102 S.Ct. 141, 70 L.Ed.2d 118 (1981). With respect to the appropriateness of these measures, this case is indistinguishable from *Teamsters Local 115*. We have upheld the Board's determination here that Conair's extreme conduct ruled out a fair, reliable election in the foreseeable future. *Teamsters Local 115* concerned an employer whose "numerous and egregious" unfair labor practices "may have so poisoned the well" that a fair election was "no longer viable." *See id.* at 396, 399–401.[96] Judge Mikva, writing for the court in *Teamsters Local 115*, cogently explained why extraordinary notice and access remedies are within the range of the Board's corrective action when employers conduct anti-union campaigns in a patently unlawful manner. We adopt his reasoning and uphold the Board's above-stated notice and access requirements.

WALD, Circuit Judge:

### C. *The Notice-Reading Order*

■ The Board, following the recommendation of the ALJ, ordered the president and owner of the company personally to read aloud to the assembled employees the Board's notice of employee rights and employer obligations. *Conair Corp.*, 261 NLRB 1189, 1289 (1982). The Employer argues that this requirement is punitive, oppressive and unwarranted. We are aware that there is support in the language of a recent decision of this court for the view that such a requirement is particularly unpleasant for the chief executive officer of a company, and should be reserved for extraordinary cases where no lesser remedy will achieve the remedial purpose. However, we uphold the Board's exercise of discretion in ordering this unusual remedy here because we find uniquely appropriate circumstances to warrant it.

The requirement that a particular management official read to employees the Board's notice of their rights, although rarely used,[97] has been subject to judicial scrutiny in this court before. In *Teamsters Local 115 v. NLRB (Haddon House)*, 640 F.2d 392 (D.C.Cir.1981), this court refused to enforce the Board's requirement that the president of a company personally read the notice. The court reached that conclusion only after a painstaking review of the facts of the case, resting its reversal of the Board on "the lack of a particularized need" for such an *ad hominem* remedy. *Id.* at 403. Most important for our purposes, the court found that the record in *Haddon House* revealed little personal involvement by the president in the employer's numerous unfair labor practices. The ALJ in that case had not recommended such a remedy, and the Board itself had articulated no special reason for singling out the president as the indispensable purveyor of the Board's findings and orders. The Board's only rationale—that the president's personal reassurance to the employees would have greater impact—would presumably have justified the same remedy in every unfair labor practice case. The court concluded in these circumstances that the personal dignity interests of the president outweighed the marginal benefits of requiring his personal participation in the public reading. The court in *Haddon House* was careful to note the presence of different circumstances in *United Dairy Farmers Cooperative Association*, 242 NLRB 1026 (1979), *remanded on other grounds*, 633 F.2d 1054 (3d Cir.1980), where the Board had also ordered the presi-

---

**96.** The Board, then uncertain as to its authority to issue nonmajority bargaining orders, did not issue one in *Teamsters Local 115*.

**97.** The Board has imposed such a requirement in at least two cases in addition to those discussed *infra. See United Supermarkets, Inc.*, 261 NLRB 1291 (1982); *The Loray Corp.*, 184 NLRB 557, 558 (1970).

dent personally to read the notice.[98] In that case the Board had emphasized the president's extensive personal participation in the violations sought to be remedied.

Thus, *Haddon House* in no way foreclosed the possibility that in another case egregious circumstances might justify the acknowledged personal indignity occasioned by the Board's extraordinary order of a presidential reading. 640 F.2d at 403. Regrettably, the Board in this follow-up case again failed to address itself specifically to the special circumstances in the record that justified this remedy. But here, as distinguished from *Haddon House,* the ALJ who recommended the remedy, and whose findings and conclusions in this matter were adopted by the Board, made ample findings of fact to support the recommendation that the president personally be required to read the Board's notice to the employees.

The ALJ found that President Rizzuto *personally and repeatedly* communicated to employees the ominous threat to transfer operations to Hong Kong if the plant were unionized. 261 NLRB at 1267–68, 1271. The threat of a plant shutdown, itself held to be an unfair labor practice beyond the protection of the first amendment, *id.* at 1271, became the centerpiece of Conair's intense anti-union campaign. Subordinate officers, in repeating the threat to employees, stressed President Rizzuto's *personal animus* against unions as the basis for the threatened relocation. *Id.* at 1267, 1269. Rizzuto also *personally* threatened employees with the withdrawal of benefits such as Christmas parties and bonuses and the employees' profit-sharing plan if the Union won. Furthermore, Rizzuto *personally*

promised his employees, in violation of section 8(a)(1), many improvements in working conditions and wages, including the "open door policy" by which grievances were solicited. *Id.* at 1264–65. Rizzuto, as well as other high company officials, issued this barrage of threats and promises at a series of unprecedented "captive audience" meetings, themselves held to violate section 8(a)(1). *Id.* at 1191 n. 15.

Thus it is apparent from the ALJ's findings, adopted by the Board, that throughout the relentless anti-union crusade at Conair Rizzuto committed himself personally to defeating the union drive by unlawful means, undermining any possibility of reasoned discussion by systematically promoting fear and promising improvements. Nevertheless, the Employer now asserts Rizzuto's personal dignity as a basis for challenging the requirement that he read aloud to employees the Board notice that Conair will not engage in such practices in the future.[99]

The president of a company may indeed ordinarily be entitled to protest as oppressive a requirement that he read to the employees, even on a single occasion,[100] a statement of their rights and his company's obligations under the Act. The dignity interests implicated by such a requirement must always be carefully weighed and may be decisive when unfair labor practices, however egregious, are carried out entirely or primarily by subordinate management personnel. But it is the pervasive personal involvement of President Rizzuto in the unfair labor practices in this case that creates the need and justification for his personal involvement in their remedy. In order to

---

**98.** The Third Circuit enforced the order without discussing the propriety of the public reading requirement. Because the employer had not challenged the remedy before the Board, the court *did not permit an initial attack on review.* 633 F.2d at 1064.

**99.** The dissent *reaches back to our decision in International Union of Elec., Radio & Machine Workers v. NLRB,* 383 F.2d 230, 234 (D.C.Cir. 1967), for language characterizing the requirement of a public reading as "incompatible with the democratic principles of the dignity of man." *See* Ginsburg dissent at 2. Our deci-

sion in the IUE case has clearly been superseded, if not actually overruled, by our more recent decision in *Haddon House,* which approved a public reading requirement though not its designation of the president as reader. *Haddon House* recast the issue in less loaded terms, invoking not absolute democratic principles of dignity but the "lack of a particularized need" for the requirement. *See supra* p. 1385.

**100.** The Board order permits Rizzuto to read the notice to the assembled employees either together or in smaller gatherings, as the Employer chooses. 261 NLRB at 1289.

dispel the atmosphere of intimidation created in large part by the president's own statements and actions, it is justifiable to require at least one formal declaration by him personally that the employees' statutory rights will be respected in the future. The Board's order can thus reasonably be said to effectuate the purposes of the Act, and is not punitive, as argued by the Employer. While we emphasize that a remedy such as that ordered here should be reserved for extraordinary circumstances giving rise to a particular remedial need, it is important to recall that the notice to be read by the president is nothing more nor less than an official statement of the statutory rights and obligations found to have been violated by the Employer. Under the special circumstances of this case, we will enforce this aspect of the Board's order.[101]

## CONCLUSION

For the reasons stated (1) we decline to enforce the portion of the Board's "make whole" directives premised on Conair's alleged discharge of strikers on April 22, 1977; (2) we decline to enforce the Board's bargaining order; (3) in all other respects we deny Conair's petition for review and grant the Board's cross-petition for enforcement of its order.

*It is so ordered.*

WALD, Circuit Judge, dissenting:

I dissent. I believe that the Board had authority under the National Labor Relations Act to order bargaining with the Union based upon its findings, accepted by the majority of this panel, that no other remedy could "dissipate the lingering effects of [Conair's] massive and unrelenting coercive conduct" which "has foreclosed any possibility of holding a fair representation election," and that "a remedial bargaining order is the only way to restore to employees their statutory right to make a free and uncoerced determination whether they wish to be represented in collective bargaining by a labor organization." *Conair Corp.,* 261 NLRB 1189, 1193 (1982). In the face of such findings, my colleagues weakly profess frustration and vexation that "employers who offend the law most egregiously will escape the most stringent remedy in the NLRB's arsenal." Maj. Op. at 1378. Yet they are forced to comb through the words of the statute and thousands of pages of its extensive legislative history for the few thin strands they weave into a statutorily-based rejection of the Board's authority to do anything about one of the worst cases of unfair labor practices it has encountered in its fifty year history. I find it paradoxical, yea incomprehensible, that they can accept the Board's findings of massive violations of the Act by the Employer, undermining embryonic labor support, and then infer from the "purpose" of the Act an intent of Congress to deprive the Board of the only remedy it believes can at some point in the

101. We confess to being rather mystified as to the legal basis for the position taken by Judge Ginsburg in her dissent. The opinion does not rely, as *Haddon House* ultimately did, on the particular facts; it appears even to concede that if the remedy is ever authorized it is appropriate here. Nor do we believe that Judge Ginsburg rests her argument heavily on the suggestion, contrary to the Board's judgment, that a reading by the president might be less effective; such an intrusion into the expert judgment of the Board would certainly be unwarranted. Finally, the appeal to the principle barring a specific performance remedy for breach of personal service contracts is inapt. That principle operates in a factual and legal context too remote to serve as the basis for overturning the Board in an exercise of remedial discretion. Yet no other legal foundation for this position is evident. The opinion cites no

statutory provision barring such a remedy. Although alluding to the supposedly "punitive quality" of the order, Ginsburg dissent at 2, the dissent does not actually appear to argue that the order is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *See Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); *Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). While the elevated language of the dissent has a vaguely constitutional ring, it identifies no constitutional provision or principle offended by the Board's action. We believe that more than an affront to the sensibilities of individual judges is required to justify wholly eliminating this remedy from the Board's arsenal.

near future restore the employees' right to make a free choice to have or not have a union. Either the Board is totally offbase in its findings, or my colleagues have usurped for themselves a mighty responsibility in emasculating the Board's remedial authority in extreme cases to fulfill its congressional mandate to "effectuate the policies of the Act."

### I. THE BOARD'S FINDINGS

The Board found not only that Conair had violated the Act, but that the violations had been so outrageous and pervasive that, in the Board's words,

> neither our traditional remedies nor even our extraordinary access and notice remedies can effectively dissipate the lingering effects of Respondent's massive and unrelenting coercive conduct. By this conduct, Respondent has foreclosed any possibility of holding a fair representation election. Under these exceptional circumstances, we find that a remedial bargaining order is the only way to restore to employees their statutory right to make a free and uncoerced determination whether they wish to be represented in collective bargaining by a labor organization.

261 NLRB at 1193. It was on the basis of these findings that the Board ordered the Employer to bargain with the Union, in spite of the Union's inability to demonstrate, through authorization cards or otherwise, that it had at any time obtained the support of a majority of the employees eligible to vote. The Board also found, however, that there was a reasonable basis to conclude that the *Union would have enjoyed majority support* but for the Employer's unfair labor practices, relying primarily upon the fact that the Union at one point had the support of forty-six percent of the employees. *Id.* at 1194.

Certainly conclusions as to the predicted effect of the Employer's illegal practices on the election process, the ineffectiveness of alternative remedies, and the probable effect of that illegal conduct on the Union's original ability to obtain majority support involve, even more than ordinary questions of fact, the utilization by the Board of its accumulated experience and expert judgment. The Supreme Court has underscored the necessity for judicial deference when reviewing such determinations. Commenting on the assertion by a circuit court that a cease and desist order and the posting of notices ordinarily would effectively remedy unfair labor practices, the Court stated, "[i]t is for the Board and not the courts ... to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). Of course, the Board must always support its conclusions with a reasoned explanation and substantial evidence in the record. It did so here.[1]

---

1. The Employer objects that the Board failed to consider changed circumstances making the issuance of a bargaining order inappropriate after the passage of six years since the unfair labor practices took place. Although it did not offer evidence of any particular changed circumstances, it argues that the Board has a duty to inquire as to whether, for example, there have been changes in the composition of the workforce or other outside forces that would tend to dissipate the lingering taint of the earlier events. Brief for Appellant [hereinafter Employer's Brief] at 43–44. The majority implicitly rejects this objection, thus reaching the issue of statutory authority; I agree that the objection fails, and I summarize my own reasoning for whatever guidance it may offer.

Neither the mere passage of time, *NLRB v. Katz,* 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107,

1114 n. 16, 8 L.Ed.2d 230 (1962), nor normal employee turnover, *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 703–06, 64 S.Ct. 817, 818–19, 88 L.Ed. 1020 (1944); *NLRB v. Ship Shape Maintenance Co., Inc.,* 474 F.2d 434, 443 (D.C.Cir. 1972), is grounds for overturning a bargaining order. However, the significance of subsequent events for the validity of a Board order is a subject of sharp dispute among the circuits and the Board. *Compare NLRB v. Drives, Inc.,* 440 F.2d 354, 366–67 (7th Cir.), *cert. denied sub nom. General Drivers & Dairy Employees v. NLRB,* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971); *G.P.D., Inc. v. NLRB,* 430 F.2d 963, 964–65 (6th Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 323 (1971); *NLRB v. Staub Cleaners, Inc.,* 418 F.2d 1086, 1089–90 (2d Cir.1969), *cert. denied,* 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970) (up-

In evaluating the impact of the unfair labor practices in *Conair,* the Board followed its analysis in *United Dairy Farmers Cooperative Association,* 257 NLRB 772, 774 (1981) (*United Dairy II*), which identified the "gravity, extent, timing, and constant repetition" of violations as the key factors bearing upon whether the employer's illegal conduct was so outrageous and pervasive as to foreclose the possibility of a fair election. 261 NLRB at 1192. Summarizing its findings as follows, the Board laid heavy stress on the repetition and insidious timing of the violations committed by this Employer:

> The chilling effect on employee rights of a single discharge or threat of plant closure is difficult enough to erase. Several

holding Board's refusal to consider subsequent events) *with Peoples Gas System, Inc. v. NLRB,* 629 F.2d 35 (D.C.Cir.1980); *NLRB v. Western Drug,* 600 F.2d 1324 (9th Cir.1979) (requiring Board to consider certain events). This court has required the Board to consider subsequent events only when particularly noteworthy events such as an unusually high rate of turnover, *NLRB v. Ship Shape Maintenance Co., Inc.,* 474 F.2d at 443, or the union's decisive loss in a valid election wholly free of employer coercion, *Peoples Gas System, Inc. v. NLRB,* 629 F.2d at 47–48, have been brought to the attention of the Board or the court. I am aware of no such event in this case. Furthermore, in neither of these two previous cases had the employer been found guilty of substantial, much less "outrageous and pervasive," unfair labor practices. *See* 474 F.2d at 442 ("[n]o overt anti-union animus . . . was demonstrated to any of its employees."); 629 F.2d at 39 (court emphasized "borderline nature of the violation" of duty to bargain). *See also NLRB v. Wilhow Corp.,* 666 F.2d 1294, 1304 (10th Cir.1981); *NLRB v. Western Drug,* 600 F.2d at 1326 (turnover need be considered only in close cases, not egregious cases). As the Fifth Circuit stated about practices similar to the Employer's here:

> Practices may live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed. The Board is not compelled to infer that past practices have attenuated, especially practices striking directly at the heart of the security of the employees, such as threats to close the plant, blacklisting, and the like.

*Bandag, Inc. v. NLRB,* 583 F.2d 765, 772 (5th Cir.1978).

Additional considerations militate against imposing a blanket requirement that the Board

repetitions of these and other violations of the Act multiply the strength and duration of the impression left on employees. The same multiplier effect results from the manner in which Respondent timed its unlawful conduct—i.e., swift and severe initial retaliation against the Union's organizational efforts, a lengthy campaign of unfair labor practices, an increase in violations as the election neared, and two unlawful discharges even after the election. In moment and duration, the timing of Respondent's unfair labor practices underscored its enduring resolve to oppose unionization by any means and deeply imprinted on employee memories the drastic consequences of seeking union representation.

inquire into possible subsequent events before issuing a bargaining order. First, it would generate enormous administrative difficulties at the Board level and possibly delay resolution of basic issues in the case including Employer liability as well as remedial measures. Second, we would reward the Employer's efforts to postpone the enforcement of an effective remedy by attaching to every normal delay in the process a "bonus" in the form of a requirement of further proceedings entailing additional delay. The Ninth Circuit, confronted with a similar issue, went to the jugular:

> [Delay] is an unfortunate but inevitable result of the process of hearing, decision and review prescribed in the Act. And to deny enforcement, with or without remand for reconsideration on the basis of facts occurring after the Board's decision, is to put a premium upon continued litigation by the employer; it can hope that the resulting delay will produce a new set of facts, as to which the Board must then readjudicate. Suppose that the Board does so, and again finds against the employer. There can then be a petition to this court, a decision by it, and a petition for certiorari to the Supreme Court. By that time there will almost surely be another new set of facts. When is the process to stop?

*NLRB v. L.B. Foster Co.,* 418 F.2d 1, 4 (9th Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970).

On occasion, especially significant subsequent events may critically undermine the Board's ability to draw educated inferences about future events from circumstances at the time of the violations, even in the case of extremely serious violations. This possibility, however, does not compel us to require the Board in this case to inquire into possible subsequent events.

*Id.* at 1193. I agree wholeheartedly with the majority that "we have no cause in this case to second guess the NLRB's expert appraisal of the quality and effects of Conair's unlawful activities."[2] We have today unanimously upheld the Board's judgment that the Employer's coercive conduct has left such an indelible mark on the workforce that not even the Board's extraordinary notice and access remedies would restore to employees their right to make an uncoerced decision about union representation.

The Board also found that it was reasonable to conclude that the Union would have enjoyed majority support but for the Employer's egregious conduct. The Board's finding on this issue, which I consider critical,[3] rests on precisely the same kind of expertise and the same body of precedent, and is thus entitled to the same degree of deference as its other conclusions concerning the seriousness and probable impact of particular unfair labor practices. Yet the majority swiftly passes over the Board's conclusion as to the probable effect of the coercive practices on the Union's initial ability to gain majority support, asserting that "[a]bsent a card majority, the Board cannot forecast with any degree of reliability how the employees would have responded in a free election." Maj. Op. at 1378–1379. This cavalier rejection of the Board's expert judgment is inconsistent with the posture of deference properly assumed with respect to the Board's closely related conclusions unanimously upheld here. Furthermore, the main study cited in support of the majority's statement actually confirms the Board's premise that serious unfair labor practices by employers have a significant effect on the level of support for the union.[4] Finally, in this case the majority agrees with the Board that the campaign of coercion was exceptionally intense and pervasive. It is in light of that assessment that I briefly review the factual basis for the Board's conclusion. The Union began its organizing campaign in March and by April 11 had the support of about forty-six percent of the employees. 261 NLRB at 1205. Yet only days after the onset of the Employer's campaign on April 4, a group of twenty-five to thirty employees approached the Union, stating that the Employer's threats had made them fear losing their jobs; several requested the return of their cards. *Id.* at 1191. The Union secured only fourteen authorization cards after April 11, the day the strike began. *Id.* at 1205 n. 15. If the Employer's conduct had such an immediate impact on employees who had already expressed their support for the Union, it was certainly reasonable for the Board to conclude that it may have had an equally inhibiting impact on the relatively small number of undecided employees— about fifteen—that would have sent the union over the fifty percent mark and into majority status for recognition purposes. There is little question but that the Union would have continued to gain adherents but for the Employer's relentless anti-union

2. Maj. Op. at 1374. The majority continues: First, this case in several respects is similar to the one other case in which the Board concluded a nonmajority bargaining order was necessary because an employer's 'outrageous' and 'pervasive' unfair labor practices precluded a fair rerun election, and it is distinguishable from cases in which the Board did not reach that conclusion. *Id.* at 1374–1375 (citations omitted).

3. *See infra* at 1370. The Board disclaims reliance on this conclusion as a necessary prerequisite to a bargaining order. Conair Corp., 261 NLRB at 1194. Because this conclusion is a significant aspect of the factual context for the Board's claim of statutory authority, however, I discuss its validity here.

4. The majority cites Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA,* 96 Harv.L.Rev. 1796, 1786 (1983) (discussing W. Dickens, Union Representation Elections: Campaign and Vote (Oct. 1980) (unpublished Ph.D. dissertation, Department of Economics, Massachusetts Institute of Technology)) for the conclusion that unions would have won just under half of all elections if employers had campaigned entirely cleanly. *See* Maj. Op. at n. 79. The same study concluded, however, that the number of pro-union votes was reduced by 15% where employer unfair labor practices included threats or actions against union supporters. Weiler, *supra,* at 1781–86. In particular, the study results indicate that employer intimidation is most effective when the union does not enjoy overwhelming support. *Id.* at 1785.

campaign. The Board's conclusion in this respect is thus supported by adequate reasoning, established Board precedent concerning the impact of various unfair labor practices, and substantial evidence in the record.

## II. THE BOARD'S AUTHORITY TO ISSUE A NON-MAJORITY BARGAINING ORDER

The Board rested its claim of statutory authority in large part on the Supreme Court's opinion in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and on subsequent judicial interpretations of that decision. I, too, find support for the Board's authority in the language and reasoning of these cases, recognizing that, as always with Supreme Court dictum and even with Supreme Court holdings, what the Court giveth it can as easily taketh away. In any event, because the issue of nonmajority bargaining orders has been smoldering on the Board and in this court for decades, I believe a searching inquiry into the language, legislative history, and underlying policies of the Act, as well as the practical effects on labor relations of upholding or overturning the Board, is called for before pronouncing judgment on either side of the issue. I find in none of these sources, singly or cumulatively, any contrary indicators to what the Supreme Court appeared to be saying in *Gissel.* On the contrary, I conclude from my inquiry that the issuance of a non-majority bargaining order under exceptional circumstances like these may well be the only way to "effectuate the policies of the Act."

### A. *The* Gissel *Decision and Category I Cases*

In *Gissel,* the Court decided that a majority of union authorization cards, unambiguous on their face, constituted "convincing evidence of majority support." If an employer refused to bargain with a union that had obtained a majority of valid cards, and at the same time committed independent unfair labor practices tending to undermine the union's majority strength and impede

the election process, the Board could issue a bargaining order as a remedy even if the union subsequently lost the election.

The Court went on to summarize in some detail the factors that determine the appropriateness of a bargaining order in three categories of cases:

Despite our reversal of the Fourth Circuit below in Nos. 573 and 691 on all major issues, the actual area of disagreement between our position here and that of the Fourth Circuit is not large as a practical matter. While refusing to validate the general use of a bargaining order in reliance on cards, the Fourth Circuit nevertheless left open the possibility of imposing a bargaining order, *without need of inquiry into majority status on the basis of cards or otherwise,* in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. Such an order would be an appropriate remedy for those practices, the court noted, if they are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." The Board itself, we should add, has long had a similar policy of issuing a bargaining order, in the absence of a § 8(a)(5) violation or even a bargaining demand, when that was the only available, effective remedy for substantial unfair labor practices.

The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a *lesser showing of employer misconduct* is appropriate, we should reemphasize, *where there is also a showing that at one point the union had a majority;* in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. 395 U.S. at 613–14, 89 S.Ct. at 1939–40 (citations omitted) (emphasis added). The

Court thus reinforced its approval of the "Category I" non-majority bargaining order described by the Fourth Circuit by indicating that a showing of majority support is necessary only in "less extraordinary cases" falling into Category II. The Court also described a third category of even less serious offenses in which no bargaining order was appropriate without an election. *Id.* at 615, 89 S.Ct. at 1941.

The Court's description of Category I cases of outrageous and pervasive violations where a bargaining order is warranted "without need of inquiry into majority status" is characterized by the majority as mere dictum, a palliative to the rejected and presumably dejected Fourth Circuit.[5] I am not as certain as the majority that the "dictum" can be so easily dismissed. In one of the four cases decided by the Court in *Gissel,* the Court appears to have applied the analysis it described as appropriate for Category I cases:

> In *Sinclair,* No. 585, the Board made a finding, left undisturbed by the First Circuit, that the employer's threats of reprisal were so coercive that, even in the absence of a § 8(a)(5) violation, a bargaining order would have been necessary to repair the unlawful effect of those threats. The Board therefore did not have to make the determination called for in the intermediate situation above that the risks that a fair rerun election might not be possible were too great to disregard the desires of the employees already expressed through the cards.

*Id.* (footnote omitted). As the majority suggests, the court's statement is cryptic, and is conceivably open to an interpretation that its reference to the "absence of a § 8(a)(5) violation" alludes only to the employer's possible lack of bad faith in refusing to bargain. *See* Maj. Op. at n. 85. But the language is also open to a reading that the Court did not feel it necessary to inquire into the majority status of the union in disposing of the *Sinclair* case. Because the extreme nature of the employer's coercive conduct made a fair election impossible and therefore placed *Sinclair* into Category I, the Board did not have to meet the Category II requirements of showing that the union had obtained a card majority and that a fair election was too unlikely to disregard this showing of majority support. This court has previously adopted the latter interpretation, declaring that the Supreme Court in *Gissel* "approved the bargaining order entered against Sinclair without a showing of a prior union majority because the facts indicated 'exceptional' or 'outrageous' unfair labor practices." *Amalgamated Clothing Workers v. NLRB,* 527 F.2d 803, 808 (D.C.Cir.1975), *cert. denied sub nom. Jimmy Richard Co. v. NLRB,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

Virtually every other court I know of has interpreted the *Gissel* decision similarly, assuming the existence of an extreme category of cases in which a bargaining order may issue in the absence of a card majority.[6] Only recently, however, did the case materialize.[7] In *United Dairy Farmers Coopera-*

---

5. *See* Maj. Op. at 1379–80; *see also Teamsters Local 115 v. NLRB,* 640 F.2d 392, 396 (D.C.Cir.1981) (*Haddon House*); Employer's Brief at 36. *Cf. United Dairy Farmers Coop. Ass'n v. NLRB,* 633 F.2d 1054, 1065–66 (3d Cir.1980).

6. *See, e.g., NLRB v. Montgomery Ward Co.,* 554 F.2d 996, 1002 (10th Cir.1977); *NLRB v. Armcor Indus., Inc.,* 535 F.2d 239, 244 (3d Cir. 1976); *J.P. Stevens Co., Gulistan Div. v. NLRB,* 441 F.2d 514, 519 (5th Cir.), *cert. den.,* 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); *NLRB v. S.S. Logan Packing Co.,* 386 F.2d 562, 570 (4th Cir.1967); *But cf. NLRB v. Roney Plaza Apartments,* 597 F.2d 1046, 1051 n. 8 (5th Cir.1979).

7. Prior to 1979, the Board had uniformly declined to issue bargaining orders, even in cases of "outrageous" and "pervasive" violations, in the absence of a showing of majority status. *E.g., Fuqua Homes Missouri, Inc.,* 201 NLRB 130 (1973); GTE Automatic Elec., Inc., 196 NLRB 902 (1972); The Loray Corp., 184 NLRB 557 (1970). It is not clear from these cases, however, that the Board believed itself to be without authority ever to order this remedy. In none of the three cases above had the precise extent of employee support for the union been litigated at all; nor had the General Counsel sought a bargaining order. Furthermore, the Board found, explicitly in The Loray Corp., 184 NLRB at 558, and implicitly in the other two cases, that other non-bargaining remedies

*tive Association v. NLRB,* 633 F.2d 1054 (3d Cir.1980), the Third Circuit faced the issue for the first time in a union appeal from the refusal by a divided Board to issue a bargaining order in a *Gissel* Category I situation.[8] After a careful analysis of the *Gissel* decision and its rationale, the court held that "the Board has the remedial authority to issue a bargaining order in the absence of a card majority and election victory if the employer has committed such 'outrageous' and 'pervasive' unfair labor practices that there is no reasonable possibility that a free and uncoerced election could be held." *Id.* at 1069.

Nonetheless, despite the *Gissel* pronouncement and a contemporary consensus of circuit court interpretations of it to the effect that the Board may issue a non-majority bargaining order to counter extraordinarily flagrant employer violations, our court decides today that the Board has no statutory authority ever to issue such an order. *See also Teamsters Local 115 v. NLRB (Haddon House),* 640 F.2d 392 (D.C. Cir.1981) (earlier misgivings about such authority).[9] With the understandable queasiness experience brings from relying too heavily on predictions of what the Supreme Court will do in the future based on what it has said in the past, I turn now to an examination of the language and legislative history of the Act to see whether the Board's interpretation of *Gissel* will hold.

## B. *The Language of the Act*

The Board points to the broad remedial mandate of section 10(c), empowering it to order a party "to take such affirmative action . . . as will effectuate the policies of [the Act]" once it has found a violation. The Employer asserts and the majority now decides that the Board's seemingly wide authority under section 10(c) is in fact securely bound by a fundamental principle of majority rule incorporated in section 9(a) which acts as an absolute limitation on the Board's authority to issue a non-majority bargaining order, whatever the circumstances.

Section 9(a) states in relevant part: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . ." 29 U.S.C. § 159(a). The Employer and the panel majority read the exclusive majority representation rule of section 9(a) into section 7, which provides that "[e]mployees shall have the right to self-organization, . . . to bargain collectively through representatives of their own choosing, . . . and shall also have the right to refrain from any or all such activities." 29 U.S.C. § 157. They say that together the two sections mean that the employees' right to bargain through representatives chosen by majority rule is violated by any Board order that requires an employer to bargain with a union that cannot demonstrate that it has at any time enjoyed the support of a majority of the employees, regardless of the egregiousness of the employer's conduct.

---

would be adequate to redress the employers' violations. As I read these cases, the Board's determination that a bargaining order was not appropriate was not so much based on its view of the limits of its statutory authority as on its expert assessment of the particular remedial requirements presented by a given set of facts.

**8.** 633 F.2d at 1064–65. Two members of the Board believed that, although the Board may have such authority under some circumstances, this was not the appropriate case for the exercise of that authority. *United Dairy Farmers Coop. Ass'n,* 242 NLRB 1026, 1028 n. 11 (3d Cir.1979) *(United Dairy I).* Two members argued that the Board did have the authority and should exercise it in this case. *Id.* at 1031–38.

**9.** In *Haddon House,* this court upheld the Board's refusal to issue a non-majority bargaining order without discussing the Board's statutory authority to do so. Faced with the same Board member lineup as the Third Circuit in *United Dairy, see supra* note 8, this court was not persuaded that the Board's decision rested on the legal conclusion of one member that the Board lacked authority. We found that the Board decision just as likely turned on the judgment of two members that the exercise of that authority was inappropriate in that case, and we therefore did not reach the question of statutory authority. 640 F.2d at 397 n. 7.

In addition, the Employer points to section 8(a)(2), which makes it an unfair labor practice for an employer "to dominate or interfere with the formation . . . of any labor organization," 29 U.S.C. § 158(a)(2), and which has been interpreted to prohibit an employer from voluntarily· recognizing a union that represents only a minority of its employees. *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

Sections 9(a) and 8(a)(2) define conduct constituting unfair labor practices on the part of employers. They appear to have no direct application to the scope of the Board's remedial authority when employers have been found guilty of unfair labor practices. Congress most assuredly knew how to limit the Board's authority. For example, section 9(b), following directly after section 9(a) and dealing with determination of bargaining units, clearly limits the Board's power. It provides "that the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit." 29 U.S.C. § 159(b). It seems obvious to me that neither section 9(a) nor any other section of the Act dealing with unfair labor practices by an *employer* can be automatically read as an explicit limitation on the authority of the *Board* to take remedial action as to those same unfair labor practices.[10]

The majority's argument that section 9(a)'s majority principle, in conjunction with section 7's guarantee of freedom of choice, limits the Board's remedial authority in all cases and for all time ignores the quintessential paradox of this case. The Employer has been found to have engaged in an intense campaign of egregious unfair labor practices in complete and deliberate disregard of the section 7 right of employees freely to choose their bargaining representatives. Now the Employer—and the panel majority—emerge as the champions of that very right of choice: they would invoke that right as an absolute bar against the Board's authority to remedy the Employer's violation by issuing a bargaining order. But in fact, by my colleagues' own admission they simply leave the employees in an eternal limbo, for the Board has determined that a bargaining order in the short run is the only means of restoring to the employees their statutory right freely to choose whether or not to be represented in the long run by a union. Thus both the Board and the panel/Employer assert the same statutory sections as the basis for their diametrically opposite positions on the permissibility of a non-majority bargaining order. I am particularly reluctant to reject the Board's construction of its remedial authority on the basis of a purported conflict with the very statutory language it is claiming to implement. The bottom line here is how the employees, having been subjected to relentless employer pressures not to choose a union, can be best restored to some kind of equilibrium in which they can choose freely for or against the Union. The Board, as the expert in the field, says this can happen only if a short-term bar-

10. The Supreme Court has on occasion limited exercise of the Board's remedial authority because of conflict with a basic policy embedded in the Act. In *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), the Court held that the Board lacked authority to order an employer to accept a particular union bargaining proposal, citing section 8(d) of the Act: "[The obligation to bargain collectively] does not compel either party to agree to a proposal or require the making of a concession . . . ." 29 U.S.C. § 158(d). The Court reached its conclusion that the Board lacked authority in that case not from section 8(d)'s language alone, however, but rather from overwhelming evidence in the legislative history that Congress explicitly intended to preclude the Board from intruding into the substantive terms of collective bargaining agreements. *See* 397 U.S. at 104–06, 90 S.Ct. at 824–25. In my view, the "plain language" of sections 7 and 9(a) offers far less support for the Employer's (and the panel's) view that the Board is barred from ever issuing a non-majority bargaining order, even when the employer has made a fair election impossible, than did the explicitly preclusive language of section 8(d), cited in *Porter*, defining exactly what the obligation to bargain did or did not mean.

gaining order is put into effect; the panel says that such an order is against statutory policy and that the employees therefore should be left in the *status quo.* Certainly the language of the statute alone does not compel Board paralysis of this sort.

## C. *Legislative History*

There is nothing in the legislative history of the Wagner Act or subsequent amendments to indicate that Congress meant to withhold this remedial power from the Board. The majority's citations prove only that Congress provided a mechanism for employees in the usual situation to pick or reject their union by majority rule and required employers to abide by that decision. There is not a single word, however, to suggest that, if a fair election could not be held because of employer interference, the Board's remedial powers were absolutely restricted by majority rule.

Of course, Congress in passing the Wagner Act embraced the principle of majority rule in the selection of bargaining representatives by employees. S.Rep. No. 573, 74th Cong., 1st Sess. 13–14 (1935); H.R.Rep. No. 972, 74th Cong., 1st Sess. 18–19 (1935). It did so to obviate refusals by employers to recognize a labor organization that represented the majority of employees, and their attempts instead to divide employees by bargaining with individuals or with a company union that represented only a minority. Congress thus associated minority bargaining by the employer with collusive and complacent company unions; it was also worried about destructive competition among unions caused by employer bargaining separately with factions or individuals. *See* H.R.Rep. No. 972 at 19. These dangers arise where an organized majority is denied recognition; they have nothing to do with a situation like this where the Board orders the employer to bargain with the only employee organization that reasonably could be expected to have gained majority support but for the outrageous and pervasive unfair labor practices of the employer.

Throughout the Act's passage, the principle of majority rule was always discussed in the context of an employer's bargaining obligations or the employees' representation choices; it was never discussed as a limitation on the Board's powers. Indeed, the Act's major sponsor, Senator Wagner, explicitly approved the possibility of a remedial bargaining order in the absence of a current majority when he approved the result in *Texas & New Orleans Railroad Co. v. Brotherhood of Railway & Steamship Clerks,* 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). *See Hearings on H.R. 6288 Before the House Comm. on Labor,* 74th Cong., 1st Sess. 21–22 (1935) (statement of Sen. Wagner). In that case, decided under the Railway Labor Act, the Supreme Court upheld the order of the district court "disestablishing" a company union which could show current majority support, and reinstating the union that had enjoyed majority support before the company's illegal and coercive campaign against it. The company was ordered to recognize the union that currently had only minority support until the employees rejected it in a fair and uncoerced election. 281 U.S. at 557, 571, 50 S.Ct. at 429, 434. In addressing that case, Senator Wagner implicitly acknowledged that strict application of the principle of majority rule must sometimes give way to the need to remedy illegal employer practices in order to permit employees genuine freedom of choice.

In general, however, non-majority bargaining orders as remedial measures were not discussed. *See* H.R.Rep. No. 972 at 21 (examples of remedial measures within Board's power). I infer from this silence at most either that Congress never conceived of the extraordinary circumstances giving rise to the need for a non-majority bargaining order or that Congress did not wish to constrain the Board's choice of remedial measures in this manner. I certainly see no way to infer, as the majority does, that the Act meant to take away from the Board this specific remedy without ever identifying it. The legislative history of the Wagner Act accordingly gives no cause to overrule the Board in its choice of remedies.

Nor does the history of subsequent amendments to the Wagner Act. The Taft-Hartley amendments in 1947 were addressed in part to perceived excesses by the Board. For instance, they limited the Board's power to certify bargaining representatives by means other than secret ballot election, 29 U.S.C. § 159(c); [11] they provided for a process by which employees could decertify a bargaining representative they no longer supported, 29 U.S.C. § 159(c)(1)(A)(ii); § 159(e)(1); they prohibited certain kinds of "closed shop" agreements which limited employment to union members, 29 U.S.C. § 158(a)(3). The Supreme Court in *Gissel,* however, demonstrated the irrelevance of any of these changes to the Board's independent power to issue a remedial bargaining order, noting the critical distinction that "[a] certified union has the benefit of numerous special privileges which are not accorded unions recognized voluntarily or under a bargaining order." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 598–99, 89 S.Ct. 1918, 1932, 23 L.Ed.2d 547 (1969).[12] Congress did not deal either in 1947 or in later amendments with the kind of remedial order issued by the Board here, which neither certifies a union nor compels union membership.

The majority argues that Congress' addition in 1959 of section 8(f), authorizing prehire agreements with unions in the construction industry even in the absence of a prior showing of majority support, reinforces the conclusion that there is no other authorized exception to the principle of majority rule. I disagree. If Congress had not passed section 8(f), employers in the construction industry, like other employers, would be barred by section 8(a)(2) from voluntarily concluding agreements with a union that cannot demonstrate majority support. Congress recognized the special needs of the construction industry and permitted such voluntary agreements. Thus, section 8(f) is an exception to a general rule that the Board's remedial order here does not contravene. In other words, the majority's view of the significance of section 8(f) is merely a recapitulation of the Employer's argument that the Act's prohibition on voluntary minority bargaining precludes a remedial non-majority bargaining order. I do not believe that this prohibition has any bearing upon the power of the Board to order bargaining where the employer has by extremely coercive conduct prevented the union from gaining a majority. *See infra* at 1367.

In sum, neither language nor legislative history contains anything to show that Congress intended to prohibit the Board from issuing a non-majority bargaining order if it is truly necessary to "effectuate the purposes of the Act." The centrality of the majority rule principle in the Act only reinforces the paradox that results from the majority's ruling today: the Board is precluded by the principle of majority rule from issuing a non-majority bargaining order when the Board has found (and the

---

**11.** Section 9(c) of the Wagner Act had permitted the Board to certify a representative by "a secret ballot of employees, or ... any other suitable method to ascertain such representatives." National Labor Relations Act, ch. 372, § 9(c), 49 Stat. 453 (1935). The Taft-Hartley amendments in 1947 substituted a more elaborate set of guidelines effectively limiting certification to unions that had gained a majority in a valid secret ballot election. Labor Management Relations Act, ch. 120, Title I, § 101, 61 Stat. 143 (1947) (codified at 29 U.S.C. § 159(c)).

**12.** For example, for a one-year period following certification, there is an irrebuttable presumption of majority status during which the employer must bargain with the union, *Brooks v. NLRB,* 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954), and during which no rival union may petition for an election, 29 U.S.C. §§ 159(c)(3); 159(e)(2), or picket for recognition, 29 U.S.C. § 158(b)(4)(C). After the one-year "certification bar" the union has the benefit of a continuing but rebuttable presumption of majority status. *Brooks v. NLRB,* 348 U.S. at 103–04, 75 S.Ct. at 181–82. In addition, the so-called "contract bar" calls for the automatic dismissal of any representation petition by a rival union during the term, up to three years, of a valid collective bargaining agreement between an employer and the certified representative of the employees. *See, e.g.,* Leonard Wholesale Meats, Inc., 136 NLRB 1000 (1962). A union that has obtained bargaining rights under a remedial bargaining order does not necessarily acquire these benefits.

panel majority has conceded) that such an order is the only effective way of restoring to employees their right to make an uncoerced majority decision about union representation. I find such statutory creativity disturbing, to say the least.

### D. *The Policy of the Act: Majority Rule and Employee Freedom of Choice*

The majority's argument—like the Employer's—appears to boil down to one of statutory ambience: Even if there is no explicit prohibition of a non-majority bargaining order in the language or legislative history of the Act, the entire statutory scheme of collective bargaining rests on the premise of majority rule and its corollary, the prohibition against minority bargaining set out in *International Ladies' Garment Workers' Union v. NLRB,* 366 U.S. 731, 738, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). Assuming that this is true, however, there is a familiar principle that the need to remedy a violation often justifies and even requires measures that might be unauthorized if undertaken on the actor's own volition. For example, state-imposed racial quotas, in the absence of an arguable constitutional violation, may run afoul of the fourteenth amendment under *Bakke.*[13] But courts clearly have the power to order race-conscious remedies for proven constitutional violations.[14] This principle also operates throughout the administration of the Act in contexts no longer in dispute. Thus, an employer would presumably violate the Act's prohibition on minority bargaining if he voluntarily recognized and bargained with a union that, although it once had a card majority, had since lost a Board election. Yet *Gissel* clearly authorizes the Board to order bargaining under such circumstances if the employer has committed substantial independent unfair labor practices. The prohibition on minority bargaining thus has no application to the permissibility of a bargaining order.

The principle of majority rule, while indeed central to the scheme of employer-employee rights and obligations, has never been mechanically applied to bind the Board in the remedial area. The *Gissel* situation is only one of several recognized by the Supreme Court in which the Board, pursuant to and consistent with the policies of the Act, may require an employer to bargain with a union that cannot demonstrate current majority status,[15] or to cease bargaining with a union that does appear to have the support of a majority.[16] Furthermore, the Board is clearly authorized to invalidate for cause the results of elections in which a majority of employees expressed their preference either for[17] or against[18] a union.

---

**13.** *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

**14.** *See Swann v. Charlotte-Mecklenburg. Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). *Cf. Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 2780, 65 L.Ed.2d 902 (1980) (10% minority set-aside is within Congress' power to enforce 14th amendment, in view of past discrimination).

**15.** The Board may order an employer to bargain with a union that had a card majority before the employer succeeded in obtaining evidence of majority support for an employer-dominated union, *International Ass'n of Machinists v. NLRB,* 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); and with a union that had a card majority but withdrew its election petition because of the employer's unfair labor practices. *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). Furthermore, an employer may not refuse to bargain with a union within one year of its certification or during the term, up to three years, of a valid collective bargaining agreement whether or not the union can still demonstrate current majority support. *Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

**16.** The Board may order an employer to cease recognizing an unlawfully dominated union even though it may have majority support. *NLRB v. Pennsylvania Greyhound Lines, Inc.,* 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831 (1937).

**17.** *See, e.g., NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) (Board should set aside election where union waived initiation fees for employees who signed cards before election). Courts have shown no reluctance to direct that a union victory be set aside in cases of union misrepresentations. *See generally* General Knit of California, Inc., 239 NLRB 619, 626 (1978) (Member Penello, dissenting) (citing 47 cases in which courts denied

**18.** See note 18 on page 1398.

In truth, the majority rule principle is inextricably tied in the statutory scenario to the unfair labor practice prohibitions against employer coercion, domination and discrimination contained in sections 8(a)(1), (2) and (3) of the Act. These limitations on employer conduct during organizational campaigns are more severe than we would tolerate in the political process, but they are acceptable in the labor context precisely because of the inherent potential for economic coercion of employees by the employer. As the Supreme Court stated in *Gissel,*

> what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may. be freer to listen more objectively and employers as a class freer to talk.

395 U.S. at 617–18, 89 S.Ct. at 1941–42. The entire statutory scheme is based on the clear congressional endorsement of the notion that only in the absence of illegal employer coercion can a majority of employees make the kind of free choice for or against union representation that is at the heart of the majority rule principle incorporated in the Act.

Thus it is heavy irony that this majority rule principle should now be touted to prevent the Board from dealing with the most intimidating tactics adopted by employers to discourage union representation. We have here a case in which the Employer has been found guilty by the Board and this court of such outrageous and pervasive violations of the Act as to destroy any electoral atmosphere in which employees may express free choice. Under these circumstances, the vigorous assertion by the Employer and the majority of the statutory rights of the employees to select or not to select a bargaining representative strikes me as either disingenuous or incredibly naive.

I would emphasize here what a remedial bargaining order does and does not do and the Board's reasoning as to how such an order can help restore to employees their right to make an uncoerced decision about union representation and collective bargaining. First, a bargaining order is not tantamount to certification, which, as we have noted, affords the union certain statutory privileges and a continuing presumption of majority status.[19] As the Supreme Court has recognized, "[t]here is, after all, nothing permanent in a bargaining order, and if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a representation petition." *NLRB v. Gissel Packing Co.,* 395 U.S. at 613, 89 S.Ct. at 1939. The bargaining order does not impose union membership.[20] Furthermore, the union's ability to impose contractual terms against the will of a majority of the employees is virtually nonexistent:

> The employees need not strike against their will. And they will generally possess some influence over the terms of the bargain, if only because the contract will often depend, in the last analysis, on their willingness to fight to obtain it. Still more important, there is every reason for the union to negotiate a contract that will

---

enforcement of Board orders based on elections with minor union misrepresentations).

**18.** *See, e.g., NLRB v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964) (upholding Board invalidation of union electoral loss where employer granted unlawful economic benefits during campaign).

**19.** *See supra* note 12.

**20.** As one commentator has noted,
"bargaining will not necessarily compel the employees to join the union or pay dues. These consequences will follow only if a un-.

ion security clause is negotiated. An employer who will violate the law to resist unionization is an unlikely prospect for a union security clause, and it will be difficult to pressure him into making this concession when the majority of the employees are opposed.
Bok, *The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act,* 78 Harv.L.Rev. 38, 135 (1964).

satisfy the majority, for the union will surely realize that it must win the support of the employees, in the face of a hostile employer, in order to survive the threat of a decertification election after a year has passed.[21]

At the same time, a bargaining order does impose a trial period during which the employees can gain exposure to the merits of union representation in the only way that remains possible when the employer has irremediably destroyed all opportunity for a free election preceded by open discussion and debate. When the employer has so flagrantly flouted the law and the rights of its employees in order to keep out the union, thereby impressing upon employees his complete and unchallengeable control over their working conditions, a bargaining order may provide the only opportunity, albeit a temporary one, for them to see at work an employee organization with which their employer is obligated to negotiate about specific proposals to better their working conditions. This interim arrangement may also serve to dissuade them of lingering fear that it is impossible to elect a union without suffering dire consequences. In grossly tainted atmospheres, only the dynamics of ongoing collective bargaining and the display of power by a functioning employee organization can dispel the overwhelming sense of impotence created by the employer's prior success in breaking up the employees' attempts at self-organization.[22]

I do not view this case, as the majority does, as presenting a conflict between employee freedom of choice and majority rule on the one hand, and the Board's determination to punish the Employer or simply deter future violations on the other. As the Board explained in its decision, the Employer has already effectively undermined any opportunity to ascertain whether an uncoerced majority would choose to be represented by this union, *Conair Corp.*, 261 NLRB at 1194, although "a reasonable basis exists for concluding that the Union would have enjoyed majority support but for Respondent's unfair labor practices." *Id.* As noted previously, the union held authorization cards from forty-six percent of the employees before the Employer's vicious campaign began to take its toll. *Id.* I would be less confident about the propriety of a bargaining order in a case in which it was not reasonably likely that the union would have gained majority support in a free atmosphere. In this case, however, the failure of the union by less than five percent to make it over the fifty percent mark at any point in its campaign demonstrates to me the imprudence of drawing this "clear bright line" where an agency's statutory authority to choose remedial measures for extreme violations is at issue.

To invoke the principle of majority rule as an absolute bar to a bargaining order in cases of extreme coercion like this introduces into the Act an unjustified premise that the employees' right to reject collective bargaining is more important than their right to choose it,[23] a premise Congress

---

**21.** *Id.*

**22.** This case thus presents a far different situation than we faced in *Local 57, Int'l Ladies' Garment Workers' Union v. NLRB,* 374 F.2d 295 (D.C.Cir.1967), *cert. denied,* 387 U.S. 942, 87 S.Ct. 2078, 18 L.Ed.2d 1328 (1967), in which the employer had violated sections 8(a)(1), (3), and (5) when it moved its operations to Florida from a unionized shop in New York. As part of its remedy, the Board ordered the employer to bargain with the union at the Florida location. We denied enforcement because the remedy violated the Florida employees' freedom to select a bargaining representative. *Id.* at 300. The Board had justified its remedy solely on the basis of the need "to deprive the company of the 'fruits' of its illegal acts," *id.,* and to

deter others, *id.* at 303. In that case, unlike this one, there had been no showing of any interest by the Florida employees in the union and no claim that they had been coerced so as to make a fair election impossible. Furthermore, the Board did not even assert that the remedy would restore to the New York employees the section 7 rights violated by the employer. In short, the Board had wholly ignored the rights of one group of employees, not even to restore the rights of another group of employees, but simply to punish the employer and deter others. This case is obviously radically different.

**23.** The Chamber of Commerce in its amicus brief openly urges this premise upon us. It argues that "(A) unionization imposes major

clearly did not endorse. To leave untouched, perhaps permanently, the negative fallout of an employer's successful campaign to wipe out organizational activity means that the employees are indefinitely presumed to have rejected the union even when they have been prevented from exercising their free choice. To permit a Board order as temporary surrogate for their right to select a union representative, on the other hand, appears a far less drastic alternative, and more in keeping with the congressional policy of encouraging free choice and collective bargaining.[24] I believe that the fundamental statutory policy of protecting employees' freedom to choose by majority rule whether to be represented by a union is not undermined but rather is advanced by a temporary non-majority bargaining order where it is reasonable to conclude that the union would have gained majority support but for the employer's outrageous and pervasive unfair labor practices, and where no other remedial measures available will remove the taint of those practices so as to permit a fair election in the foreseeable future. I simply do not understand the logic of the majority's walk-away construction when confronted with violations of these dimensions and impact.

E. *The Policy of the Act: Deterrence*

In the face of coercive conduct as grave, deliberate and unrelenting as the Employer's conduct here, the Supreme Court has also said that the Board may properly give *increased weight to the deterrent effect of a proposed remedy.* The *Gissel* Court stressed the importance of deterring the extreme misconduct covered by Category I; only on a "lesser showing of employer misconduct" covered by Category II did the Court deem the goal of "effectuating ascertainable employee free choice ... as important a goal as deterring employer misbehavior," and consequently require "a showing that at one point the union had a majority." 395 U.S. at 614, 89 S.Ct. at 1940.

The deterrent value of a bargaining order against an employer who has engaged in egregious illegal behavior is apparent. The prospect of a remedial bargaining order should create a strong incentive for the anti-union employer to keep its campaign within legal limits. For even if the company wins the organizational battle, it may lose the collective bargaining war. On the other hand, today's decision that no bargaining order can ever issue unless the union has gained the support of more than half the unit employees at some point in the process creates reverse and indeed perverse incentives. The anti-union employer can avoid ever dealing with a union by rushing in at the first sign of union sentiment, before employees have begun to experience the collective strength of numbers, with threats of plant closings, mass discharges and close surveillance, thereby creating an atmosphere of coercion that outlasts the tenure of current employees and outdistances the remedial powers of the Board. Indeed, we need not conjure up such a hypothetical horror story, for the Employer here has done precisely that. The Act is dealt a debilitating blow by the majority's ruling and the Board is deprived of its only effective means to remedy and deter a massive campaign of coercive and illegal conduct by an employer bent on crushing inchoate union organization.

Thus I would uphold the Board's authority to issue a bargaining order even in the absence of a positive showing of majority support for the union in the circumstances

---

burdens on personal liberty that most Americans refuse to accept, and (B) the Act contemplates that those burdens will be imposed only in response to the active, demonstrated, majority will of the employee unit." Brief of amicus curiae Chamber of Commerce at 8.

**24.** The majority complains that I "would substitute for the coercion Conair imposed an opposing coercive force imposed by the government." Maj. Op. at 1383. I view the choice

differently. Faced with massive and documented coercion by Conair that the majority agrees made a free election impossible, the Board applied the only remedy it found effective, even though there was a theoretical possibility (almost purely hypothetical in this case) that undesired union representation might be temporarily imposed on employees. So viewed, the Board's and my choice seems not only justifiable but necessary under the Act.

in this case, in which (1) the employer has engaged in unfair labor practices so pervasive and outrageous that there is no reasonable possibility of a fair election, and that even the Board's ordinary and extraordinary non-bargaining remedies will not restore to employees their right to choose or reject union representation free from employer coercion; and (2) it is reasonable to conclude that the union would have gained the support of the majority but for the employer's extremely coercive illegal conduct. On this basis, I respectfully dissent.

GINSBURG, Circuit Judge, dissenting as to the requirement that the Company's president read the Board's notice aloud to assembled employees:

I would modify the extraordinary notice remedies in one respect. The Board's order requires that Conair's president, Leandro Rizzuto, personally read the Board's cease and desist notice to an assembly of employees; I would allow Rizzuto to choose between reading the notice himself or designating a responsible officer to read it on his behalf.

The Board's order specifies that the Company's

> owner and president, Rizzuto, ... shall ... read the notice to current employees assembled for that purpose....

*Conair Corp.*, 261 NLRB 1189, 1285 (1982) (ALJ Opinion).

In *Teamsters Local 115 v. NLRB*, 640 F.2d 392 (D.C.Cir.), *cert. denied*, 454 U.S. 837, 102 S.Ct. 141, 70 L.Ed.2d 118 (1981), the Board similarly required that "the [Company] president, Harold Anderson, personally read a copy of the notice to an assembly of the employees." 640 F.2d at 401. Our opinion in that case summarized the history of Board public reading orders (they originated when the illiteracy of employees was a large concern), *id.* at 401–03, and noted the grave reservations this court had earlier expressed regarding such orders in *International Union of Electrical, Radio & Machine Workers v. NLRB (Scott's, Inc.)*, 383 F.2d 230, 232–34 (D.C.Cir.1967), *cert. denied*, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968). *See* 640 F.2d at 402. We enforced the pub-

lic reading requirement in *Teamsters Local 115* with this modification: we directed the Board to specify as the reader, in lieu of the president, simply "a responsible officer of [the Company]." *Id.* at 403–04.

*Teamsters Local 115* is distinguishable from this case. We observed there that "[o]f all the unfair labor practices found by the Board," the president had personally performed "only one." *Id.* at 403. Here, the president's personal involvement was far more conspicuous. His voice behind the Board's order might most authoritatively indicate to employees that Conair will comply with the directive. Nonetheless, a reading order "directed at a specified individual" is a "startling innovation." *Id.* Such an order would occasion no surprise in a system in which those who offend against state regulation must confess and repent as a means of self-correction, or to educate others. But it is foreign to our system to force named individuals to speak prescribed words to attain rehabilitation or to enlighten an assembled audience. The Board, I believe, has not thoughtfully considered this point.

A forced, public "confession of sins," even by an owner-president who has acted outrageously, is a humiliation this court once termed "incompatible with the democratic principles of the dignity of man." *International Union of Electrical, Radio & Machine Workers*, 383 F.2d at 234. It has a punitive, vindictive quality, *see Teamsters Local 115*, 640 F.2d at 401, and is the kind of personal performance command equity decrees have avoided. *See* Restatement (Second) of Contracts § 367 (1979); *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng.Rep. 749 (Q.B.1853); *cf. Lumley v. Wagner*, 1 DeG., M. & G. 604, 42 Eng.Rep. 687 (Ch.1852) (acknowledging lack of authority to grant specific performance of defendant's concert singing obligations, court issued injunction preventing defendant from breaching covenant not to sing elsewhere). Moreover, as Board Chairman Van de Water noted, *Conair*, 261 NLRB at 1195 n. 28, a reading of the notice by the president may be less effective than a reading by another responsible officer. The former, humiliated and degraded by the personal specific performance order, may dem-

onstrate "by inflections and facial expressions, his disagreement with the terms of the notice." *Id.* The latter, assigned the task but lacking the same personal involvement, may perform it with less distaste, more detachment, and thus with greater credibility. I would not single out the president here, or any other named individual, hand him lines, and make him sing.

GINSBURG, Circuit Judge, separate concurring statement:

I note as a postscript to the many pages we have written that as a court of review we must wrestle with the "matters of high principle" aired in this case. *See* Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA,* 96 HARV.L.REV. 1769, 1794 (1983). The point has been made tellingly, however, that "[i]f the law is to have any chance of vindicating the employees' group right to 'bargain collectively through representatives of their own choosing,' the [relief] it promises must come quickly." *Id.* at 1793. We write as 1983 runs out about a unionization campaign that occurred in the spring and summer of 1977. The long delays at every stage of this and similar proceedings may indeed render the Board's remedies, however stiff, "beside the point." *Id.* at 1794 (footnote omitted).